PUBLIC SERVICE COORDINATED TRANSPORT AND BOARD OF PUBLIC UTILITY COMMISSIONERS, APPLICANTS-RESPONDENTS, v. NEWARK-ELIZABETH INDEPENDENT BUS OWNERS ASSOCIATION, NORTH NEWARK INDEPENDENT BUS OWNERS ASSOCIATION AND WILL MORRIS, INC., OBJECTORS-APPELLANTS.

Argued October 17, 1949—Decided November 7, 1949.

*Mr. Charles J. Malloy* argued the cause for the objectors-appellants (*Mr. Paul J. O'Neill,* attorney).

*Mr. William H. Speer* argued the cause for the applicant-respondent, Public Service Coordinated Transport. *Mr. Winslow B. Ingham, II,* on the brief.

The opinion of the court was delivered by
BURLING, J. This is an appeal by Newark-Elizabeth Independent Bus Owners Association, North Newark Independent Bus Owners Association, and Will Morris, Inc., from a judg-

ment of the Appellate Division of the Superior Court of New Jersey made on June 16, 1949, based upon a unanimous opinion affirming a decision of the Board of Public Utility Commissioners under date of October 20, 1948, approving the application of Public Service Coordinated Transport for the utilization of auto busses in lieu of all-service vehicles (trolley busses) operated by it on its Mt. Prospect All-service Line No. 27, extending from Nye Avenue and 20th Street in Irvington, New Jersey, to Verona Avenue, in Newark, New Jersey.

The appeal is before us on the theory that a constitutional question is involved. Constitution of 1947, *Article VI, section V, paragraph* 1(a). *Supreme Court Rule* 1:2–1(a).

The action of the Board of Public Utility Commissioners in approving the respondent's application was predicated upon *R. S.* 48:15–41, as amended by *P. L.* 1946, *c.* 71, the pertinent part of which provides as follows:

"* * * Whenever the Board of Public Utility Commissioners has approved * * * the substitution of vehicles of the character described herein (trolley buses) on any line (of street railway) or part thereof, * * * the company operating any such line may, from time to time, with the approval of the Board of Public Utility Commissioners, utilize in lieu of such vehicles, autobusses in the operation of any such line, or part thereof, * * *."

The foregoing statute contains no provision requiring an applicant to obtain the consent of the municipalities through which the line is operated.

It is conceded that the respondent, Public Service Coordinated Transport, did not procure municipal consent of the Town of Irvington and the City of Newark, in which municipalities the aforesaid route is located, for the operation of the said autobusses.

It is the contention of the appellants that the foregoing statute should be read in conjunction with *R. S.* 48:4–3, as amended by *P. L.* 1946, *c.* 131, which provides as follows:

"No autobus shall be operated or run while carrying passengers for hire wholly or partly along any street in any municipality, whether

such operation is over a route wholly or partly within the territorial limits of the municipality, except as set forth in section 48:4-10 of this Title, until the person owning or possessing the right to use the same shall obtain the consent of such municipality given by its governing body or the official board or body thereof which by law has control of the public streets therein for such operation and the use of any street or streets in such municipality;  *  *  *."

The appellants urge that unless the two foregoing statutes are read together, then *R. S.* 48:15-41 in so far as it relieves the respondent from the necessity of obtaining municipal consent for the operation of autobusses is violative of the equal protection clause of section 1 of the Fourteenth Amendment of the United States Constitution. This argument flows from the fact that the appellants are engaged in the operation of autobus lines in competition with the respondent and are required to obtain the consent of the municipalities through which their autobusses are operated, pursuant to *R. S.* 48:4-3.

We are met at the outset by the contention advanced on behalf of the respondent, Public Service Coordinated Transport, that the appellants have no legal standing to question the constitutionality of *R. S.* 48:15-41, as amended, and the proceedings thereunder in the instant case, because (a) the statute was not passed for the benefit of the appellants and (b) there is no evidence that the appellants have been injuriously affected by the operation of the statute in the instant proceedings.

██ We shall first direct our attention to a consideration of the question of status raised by the respondent, as it was urged below. The appellants have not argued this point in their brief, being content to stand upon that part of the opinion of the Appellate Division, hereinafter discussed, which decided the point favorably to them. Our examination of the authorities in this State discloses the relevant rule to be that the regulation and control of public utilities by statutory authority is for the benefit of the State and its citizens, and not for the benefit of established utilities or competitors of a rival company which may obtain a franchise or operating right in accordance with pertinent enabling legislation. The corollary of this rule is that a competitor is not a party in

interest who can collaterally attack a franchise or operating right granted to a rival pursuant to such statutory authority.

The principal thus enunciated was established in this State in *Elizabethtown Gas-Light Co. v. Green,* 46 *N. J. Eq.* 118 (*Ch.* 1889); affirmed, 49 *N. J. Eq.* 329 (*E. & A.* 1892). In that case the complainant by a special statute was created a body corporate for the purpose of selling gas to the City of Elizabeth, with power of opening the streets and laying its pipes therein. It established its works and was supplying gas to the City of Elizabeth when, in 1870 the Legislature created the Metropolitan Gas Light Company of Elizabeth. The Elizabethtown Company there asserted that the Metropolitan Company had no right, in any capacity, to the franchises they were exercising and that their claim to them was false, fraudulent and without warrant of law; and that the legislative grant was only to take effect after the stockholders had paid $30,000, and, as the truth was that that sum had never been paid, the grant never acquired vitality, and that, as a consequence, the Metropolitan Company stood precisely in the same condition as it would if it had no grant. On this latter contention, Vice-Chancellor Van Fleet said:

At page 129 of 46 *N. J. Eq.*:

"It is not necessary, in my judgment, to decide whether this argument construes the grant made to the Metropolitan Company correctly or not, for, if it be conceded that it does, still it is certain, beyond all dispute, that until it is made clearly to appear that the condition in question was imposed in favor of the complainant, or for its benefit, so that it has a clear right to demand its observance, the complainant's position, with respect to the condition is that simply of a stranger, and hence it stands without the least pretence of right to complain of its breach. It is only the parties to a grant made subject to conditions, or those in whose behalf or for whose benefit the conditions are imposed, that have a right to ask that they shall be performed, or to seek protection against their breach, or redress for their violation."

It was followed in *Public Service Railway Co. v. Reinhardt,* 92 *N. J. Eq.* 365 (*Ch.* 1921); affirmed, 93 *N. J. Eq.* 461 (*E. & A.* 1921), as the result of an evenly divided vote in the Appellate Court; although under the then existing practice all that was decided in that court was that the judgment

below should be affirmed (*Dewey Land Co. v. Stevens,* 83 *N. J. Eq.* 314 (*E. & A.* 1914)), opinions were filed on the two viewpoints by two of the Justices. In that case it was determined by the Chancery Court that the Act of March 17, 1916 (*P. L.* 1916, *p.* 283), which required the owners of autobusses in cities to perform certain duties and procure municipal consent as a condition precedent to the right to operate, could not be said to have been enacted for the benefit of street railway companies and, in consequence, a street railway company could have no standing in a court of equity to restrain the operation of an unlicensed autobus line.

The same principle was followed in *Healy v. Sidone,* 127 *A.* 520 (*Ch.* 1923) and *Marathon Bus Line v. Board of Public Utility Commissioners,* 8 *N. J. Misc.* 379 (*Sup. Ct.* 1930), and cited with approval in *Junction Water Co. v. Riddle,* 108 *N. J. Eq.* 523 (*Ch.* 1931).

Justice Minturn, in a dissent from the view of the Vice-Chancellor, in the *Reinhardt case, supra,* held that a franchise is such a property right as vests a legal right in a person, to whom it has been granted by proper authority, to seek relief from a usurpation or trespass upon such property right by a competitor. Even the rationale of that dissent is of no comfort or help to the appellants in the instant case. The record discloses no evidence that the appellants have been or will be adversely affected, or that any usurpation or trespass upon their rights has resulted or will result *in futuro* as a consequence of the challenged statute and proceedings thereunder. The uncontroverted evidence shows that respondent Public Service Coordinated Transport, has been authorized to substitute 35 autobusses for a similar number of trolley busses in its operation over the route in question. It is true that respondent's bus line runs parallel with the bus lines of the appellants over a part of the route, but that condition previously existed and has not been changed by the challenged proceedings. It does not appear how the substitution of the same number of autobusses for trolley busses, operating over exactly the same route, could have an adverse effect upon the existing business of the appellants. The absence of proof of

real injury has been held to be fatal to one endeavoring to attack the validity of an enactment. *Bowers v. Middlesex County,* 127 *N. J. L.* 471 (*Sup. Ct.* 1941).

The principle of law, established in the *Elizabethtown Gas-Light case, supra,* in 1889, and followed by our courts since that time, is controlling in the present issue unless it is found to be contrary to some statutory expression.

Our attention has been directed to *R. S.* 48:4–11 which provides, *inter alia:* "Proceedings to prevent a person from operating an autobus without a valid municipal consent, may be instituted by any public utility, the business or revenues of which are adversely affected thereby."

The opinion of the Appellate Division concluded that the above statutory expression conferred sufficient legal standing upon the appellants to challenge the proceedings under review. We do not agree with that conclusion for two reasons. First, because as hereinabove indicated, there is no evidence that the challenged proceedings permitting the substitution of autobusses for a like number of trolley busses to be operated over the exactly same route has in any manner adversely affected the business or revenues of the appellants. Secondly, because *R. S.* 48:4–11 is not applicable to street railways operating under *R. S.* 48:15–41. Public Service Coordinated Transport is the successor to Public Service Railway Company and Public Service Transportation Company. Public Service Railway Company was organized on August 20, 1907, under the provisions of the Traction Act of 1893 (*P. L.* 1893, *p.* 302) as a street railway company.

The history of pertinent legislative action relating to street railway companies is as follows: The first legislation which directly gave authority to street railways to operate autobusses was Chapter 244 of the Laws of 1925, *R. S.* 48:15–37. That Act required street railway companies to obtain municipal consents as a condition to the operation of autobusses. Chapter 52 of the Laws of 1928, *R. S.* 48:15–38, directly permitted such companies to substitute autobusses for street railway service and again required the obtaining of municipal consents for such bus operation. Chapter 124 of the Laws of

1934, *R. S.* 48:15–41, directly permitted such companies to substitute trolley busses for trolley cars "in the operation of its lines or any part thereof over which it has a franchise for electric street railway operation," "and for the purpose of providing electric power for the operation of such vehicles as aforesaid may construct an overhead ground wire parallel to each trolley wire or wires in all streets and highways in which it now has the right to operate street cars," upon receiving approval of the Public Utility Commission. That statute did not impose any requirement that municipal consent be obtained. Chapter 71 of the Laws of 1946, *R. S.* 48:15–41, directly permitted such companies to substitute autobusses for trolley busses upon receiving approval of the Public Utility Commission. This statute, like the 1934 act, imposed no requirement that municipal consent be obtained.

*R. S.* 48:4–3, under which the appellants derived their rights to operate autobusses along the streets of municipalities, had its source in Chapter 136 of the Laws of 1916. That Act, commonly known as the Kates Act, is entitled "An Act concerning auto busses, commonly called jitneys, and their operation in cities." It prescribed the conditions upon which autobusses were permitted to operate in municipalities. One of the conditions imposed thereby was the obtaining of the consent of the municipality along the streets of which the autobus was to be operated. That condition was contained in paragraph 2 of the Kates Act which, as indicated, is the source of *R. S.* 48:4–3, as amended. That Act made no reference to the operation of autobusses by street railways. *R. S.* 48:4–11 is a part of the so-called Kates Act, *R. S.* 48:4–3 (*P. L.* 1916, *c.* 136) amended by *P. L.* 1926, *c.* 144.

The history of the legislation indicates clearly that the operation of autobusses by street railway companies was regulated by legislation separate and distinct from the Kates Act of 1916 and its amendments which regulated the operation of autobusses generally. None of the rights granted to street railways to substitute one type of motive power or one type of vehicle for another, nor any of the obligations or burdens incident to the operation of such vehicles by such companies

are derived under the Kates Act. Moreover, the burdens imposed upon street railway companies, in addition to those reflected in the above statutes directly prescribing for such companies, by legislation of and prior to 1896, *R. S.* 48:15–29 and *R. S.* 48:15–31, were much more onerous than those imposed by the Kates Act upon the appellants and other persons deriving their rights thereunder.

For the reasons stated herein, it appears that the appellants have not the requisite legal standing to attack the constitutionality of *R. S.* 48:15–41 and the proceedings pursuant thereto in the instant case.

However, since the case was ripe for argument, a full hearing on the constitutional question was conducted. The appellants urge that *R. S.* 48:15–41 is violative of the "equal protection clause" of the Fourteenth Amendment of the United States Constitution and rely upon *Truax v. Corrigan,* 257 *U. S.* 312 (1921). *Barbier v. Connolly,* 113 *U. S.* 27 (1885) and *Yick Wo v. Hopkins,* 119 *U. S.* 356 (1886). The nub of the decisions in those cases is to the effect that classification must regard real differences between persons, that no impediments should be interposed to the pursuits of anyone except as applied to the same pursuits by others under like circumstances and that illegal discriminations should not be made between persons in similar circumstances. The doctrine of those cases has become deeply imbedded in our constitutional law and is fully recognized by our courts. Many of the cases discussing the subject of classification in this state are cited in *Raymond v. Township Council of Teaneck,* 118 *N. J. L.* 109 (*E. & A.* 1937), wherein the court said:

At page 111 of 118 *N. J. L.:*

"It is within the competency of the legislature to classify objects of legislation; and in the exercise of this power it possesses a large measure of discretion. But the classification, to have the virtue of constitutional generality, must rest upon distinctions that are substantial and not merely illusory. The test is whether the statutory class has a logical and reasonable basis, free from artificiality and arbitrariness, embracing all and omitting none naturally falling into that category. Is it legislation of such a character as is equally appro-

priate to all forming the statutory class, and is that class embracive of all in like situation and circumstances, and therefore natural members of the class so created? If, viewed in the light of the legislative design, the necessity or propriety of the classification reasonably appears, it is not within the constitutional interdict."

the subject was fully considered by this court in *Washington National Insurance Co. v. Board of Review*, 1 *N. J.* 545 (*Sup. Ct.* 1949).

■ Application of the doctrine to the factual situation under review offers no relief for the appellants. The parties in the present case cannot be said to be in similar circumstances. They were authorized to pursue the business of transportation of passengers under entirely different enabling statutes. The respondent, as pointed out herein and in the opinion below, was originally required to secure municipal approval and was required to comply with additional statutory regulations which were far more onerous than those imposed upon the appellants.

■ Appellants urge that the effect of the Board's decision in its application of *R. S.* 48:15–41 in the instant proceeding will enable the respondent to increase the number of its autobusses by securing only the approval of the Board, while the appellants desiring to increase the number of autobusses on their respective lines must not only secure the Board's approval but must also secure the municipal consents pursuant to *R. S.* 48:4–3. This contention is without merit in the present case. *R. S.* 48:15–41 makes no provision for increasing the number of autobusses; it confines itself to the substitution of autobusses for trolley busses. The word "substitution" connotes the replacement of one unit for another unit. "Substitution" is defined in Webster's New International Dictionary, Second Edition, unabridged, as "The designation by a person of a person or thing to take the place of himself or another person or of some other thing." In the instant case, the respondent had previously received approval to operate not more than 35 trolley busses over the route in question. The Public Utility Commission, on October 20, 1948, approved the utilization of "not more than thirty five

(35) autobusses as provided for in *R. S.* 48:15–41 in lieu of vehicles now operated" over the same route.

A further point urged by the appellants, attacking *R. S.* 48:15–41 (*P. L.* 1946, *c.* 71) as being "legally deficient since the body of the Act is inconsistent with the title," does not appear to have been raised below nor was it properly presented in the appellant's brief in accordance with *Supreme Court Rule* 1:3–2(c). It has been considered, however, and found to be without merit.

For the reasons herein, the judgment of the Appellate Division is affirmed.

*For affirmance*—Justices CASE, OLIPHANT, BURLING and ACKERSON—4.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER and WACHENFELD—3.