ELIZABETH FEDERAL SAVINGS AND LOAN ASSOCIATION, *ETC.*, *ET AL.*, APPELLANTS, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF NEW JERSEY, COLONIAL SAVINGS AND LOAN ASSOCIATION, *ETC.*, *ET ANO.*, RESPONDENTS.

CITY FEDERAL SAVINGS AND LOAN ASSOCIATION, *ETC.*, APPELLANTS, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF NEW JERSEY, COLONIAL SAVINGS AND LOAN ASSOCIATION, *ETC.*, *ET ANO.*, RESPONDENTS.

UNION COUNTY TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, APPELLANT, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF THE STATE OF NEW JERSEY, COLONIAL SAVINGS AND LOAN ASSOCIATION, *ETC.*, *ET ANO.*, RESPONDENTS.

Argued March 25, 1957—Decided June 10, 1957.

490

Mr. *Frank K. Sauer* argued the cause for the appellants Elizabeth Federal Savings and Loan Association, Emerald Savings and Loan Association, Union County Savings Bank, and Central Home Trust Company (*Messrs. Sauer & Wojcik,* attorneys).

Mr. *Fred G. Stickel, Jr.,* argued the cause for the appellant City Federal Savings and Loan Association (*Messrs. Stickel & Stickel,* attorneys; *Mr. Fred Stickel, III,* on the brief).

Mr. *Alan V. Lowenstein* argued the cause for the appellant Union County Trust Company (*Messrs. Lowenstein, Del Tufo, Callahan & Kean,* attorneys; *Mr. Aaron Kaufman,* of counsel; *Mr. Richard M. Sandler,* on the brief).

Mr. *David D. Furman,* Deputy Attorney-General argued the cause for the respondent Commissioner of Banking and Insurance (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

Mr. *Richard V. Stein* argued the cause for the respondent Colonial Savings and Loan Association (*Messrs. Stein, Stein and Hughes,* attorneys).

The opinion of the court was delivered by

VANDERBILT, C. J. The case before us involves the application of sub-section B of section 21 of the "Savings and Loan Act," *L.* 1946, *c.* 56 (*N. J. S. A.* 17:12A–1 *et seq.*) as amended by *L.* 1952, *c.* 204. Under the authority of that subsection the Commissioner of Banking and Insurance granted permission to the Colonial Savings and Loan Association of Roselle Park to establish a branch office in the City of Elizabeth through the purchase of the Excelsior Building and Loan Association in Elizabeth and move it to a substitute location. The appellants—a savings bank,

two trust companies with savings departments, two saving and loan associations chartered under federal law, and one similar association organized under the state banking laws —objected to any such approval and by these proceedings seek to review the Commissioner's determination.

## THE FACTS

The Colonial Savings and Loan Association has its principal office in Roselle Park, N. J. where it has done business since 1904. At the end of 1955 it had 3,139 savings members and 1,029 borrowing members. About three miles away in the City of Elizabeth, the Excelsior Building and Loan Association maintained its office at No. 715 Elizabeth Avenue. It has been in business since 1887 and at its present location, an upper floor in an office building, for upwards of 25 years. It has about 358 savings members and 54 borrowers. These associations entered into an agreement, providing in essence for the purchase by Colonial of all of the assets of Excelsior and for a transfer of the principal office of Excelsior, presumably under *N. J. S. A.* 17:12A–24, to a new location to be selected by Colonial, or for an application by Colonial to the Commissioner of Banking and Insurance for permission to change the location of the office of Excelsior to a "suitable substitute" to be selected by Colonial and to maintain that new office as a branch office of Colonial, under *N. J. S. A.* 17:12A–21, *subd. B.* The agreement was made contingent upon the approval by the Commissioner of the changed location. Colonial chose the second alternative and applied to the Commissioner for permission to establish a branch office at 29 Broad Street, Elizabeth, as a "suitable substitute" for the office of Excelsior at No. 715 Elizabeth Avenue. The proposed location is about 8/10ths of a mile away from Excelsior's principal office and in the midst of the establishments maintained by Elizabeth Federal Savings and Loan Association, Emerald Savings and Loan Association, Union County Savings Bank, Central Home Trust Company, City Federal Savings and Loan

Association and Union County Trust Company, the appellants herein.

No notice of Colonial's application was given to any of the appellants. When they learned of it, however, they wrote to the Commissioner indicating their objections to the proposed action and asked to be heard. The Commissioner took the position that nothing in subsection B of section 21 of the act, *N. J. S. A.* 17:12A–21, required that notice of an application for approval of a branch office in connection with a merger or bulk purchase of assets be given to any other institutions, and that there was no statutory basis for a formal hearing. Nevertheless, without recognizing them as "parties," he afforded the objectants an opportunity to present whatever evidence and argument they had in opposition to the application of Colonial. These proceedings, however, could by no means be characterized as a full hearing in the true sense of the word. While the objectants were given every opportunity to present their own evidence, they were in substantial respects denied the opportunity to meet the evidence on the other side of the case and that relied upon by the Commissioner. Some of the evidence was furnished *ex parte* by Colonial to the Commissioner and not made available to the objectants. The Commissioner in reaching his conclusion also considered data available in the files of the Department of Banking and Insurance and furnished by a departmental investigation of Colonial's application and by a survey of the territory in question, but not made part of the hearing record.

In granting the application by Colonial the Commissioner found:

"* * * that the maintenance by 'Colonial' of a branch at 29 Broad Street, Elizabeth, will be in the public interest; that it will be of benefit to the area to be served, and that it will be beneficial to the members of both 'Colonial' and 'Excelsior,' and permission is hereby given to the establishment and maintenance of said branch by the 'Colonial.'"

The objecting institutions, asserting a right to a review of the Commissioner's determination on the ground that

they were aggrieved parties, since the determination made it possible for Colonial to compete directly with them for savings and thrift deposits in their area, appealed under *R. R.* 4:88–8 to the Appellate Division of the Superior Court in three separate groups. Colonial then moved to dismiss all the proceedings on the ground that the appellants had no standing to appeal. Decision on that question was reserved until final argument and the appeals were consolidated. We then certified the matters on our own motion pursuant to *R. R.* 1:10–1(*a*), and the argument of all the parties and of all issues has been conducted before this court.

The case presents these questions: (1) whether the appellants have any standing to seek judicial review of the action of the Commissioner; (2) whether the objecting institutions were entitled to notice and a full hearing on Colonial's application for the Commissioner's approval, and if so, whether the hearing afforded was sufficient in the circumstances; and (3) whether the Commissioner properly discharged the power delegated to him.

### The Statutes

Savings and loan associations and building and loan associations organized under the laws of this State are now controlled by the "Savings and Loan Act," *supra, N. J. S. A.* 17:12A–1 *et seq.* Subsection A of section 21 of that act, *N. J. S. A.* 17:12A–21, provides that if the capital, reserve and undivided profit requirements therein set forth are met, an association may establish a branch office in the municipality in which it has its main or principal office, or it may establish a branch office in any other municipality in the county of its principal office, but that no such branch office may be established in another municipality if any other state or federal association has its principal office or a branch office in operation there. Application to and approval by the Commissioner of Banking and Insurance is made a requirement of such action by subsection A(4) of section 21:

"Before any branch office shall be established, the association shall file written application with the commissioner for his approval.

Before approving such application, the commissioner shall determine that the maintenance of such branch office is in the public interest and will be of benefit to the area served by such branch office, and that it may be established without undue injury to any other association or Federal association in the area in which it is proposed to locate such branch office and that conditions in the area to be served, afford reasonable promise of successful operation.

Within ten days after the submission of any such application to the commissioner, *the applying association shall give notice by mail of such application to all associations and Federal associations, having offices within the municipality in which it is proposed to locate the branch office and outside of such municipality if within five miles of the place where it is proposed to locate such branch office.* The notice shall be in a form approved by the commissioner, and shall include the name of the applying association and the street address and municipality where such branch office is to be located. Upon the request of the applying association, the commissioner shall furnish a written list showing the names and street addresses of all State chartered associations to which such notice must be sent. *The commissioner shall conduct such investigation or hearing or both, as he may deem to be advisable.*

Not less than thirty days after mailing of the aforementioned notice and within ninety days thereafter, the commissioner shall announce his decision upon such application and file in his office, a written memorandum stating the reasons therefore, which shall be open to public inspection." (Emphasis supplied.)

The absence from subsection B of section 21 of any express reference to a hearing or to notice on an application for approval of the establishment of a branch office through purchase of another association or merger, particularly since express provisions for notice or hearing are made with respect to applications for approval in related cases under subsections A and C, gives rise to the conflict in this case. Subsection B provides:

"B. Notwithstanding any of the other provisions or limitations of this section, any association into which another association has been merged or which has acquired, by purchase, reorganization, or in any other manner, all or a substantial portion of the assets of another association, may, with the permission of the commissioner, and under such terms and conditions as he may prescribe, maintain the office previously maintained by such other association, or a suitable substitute therefor, as a branch office; *provided, however,* that the commissioner shall first determine that the maintenance of such branch is in the public interest and will be of benefit to the area served by such branch and to the members of the association."

Subsection C provides:

"C. A branch office may be removed from one location to another upon application to, and approval by the commissioner, provided that the proposed new location is within the area prescribed for a new branch office. Within ten days after filing such application, *the association shall give the same notice as that required in connection with an application for a new branch office* and the commissioner shall render his decision within the time limits prescribed in connection with the application for a new branch office." (Emphasis supplied.)

Closely related to the problem presented by the instant case are the provisions of section 24 of the act, as amended by *L.* 1953, *c.* 136, *N. J. S. A.* 17:12A–24. That section provides that:

"Any association may change the location of its principal office to a new location but, where the office is to be removed from one municipality to another, such change shall take place only after application to and the written approval of the commissioner of such change of location. *Within ten days after the submission of any such application, the commissioner shall give written notice by mail to the association of a time and place designated by him for a hearing on such application.* The time designated for such hearing shall be not less than six weeks nor more than eight weeks after the date upon which the commissioner mails such notice. *The association shall thereupon give notice by mail of such application and of the time and place designated by the commissioner for a hearing thereon at least three weeks prior to the date of such hearing to all associations located within the municipality in which it is proposed to locate the office of the association.*

Upon the request of the association, the commissioner shall furnish a written list showing the names and street addresses of all associations to which such notice must be sent.

The notice shall set forth the name of the association, the street address and municipality from which its location is to be changed and the street address and municipality to which its location is to be changed. Within thirty days after the close of the hearing, the commissioner shall announce his decision upon such application and file in his office a written memorandum stating the reasons therefor, which shall be open to public inspection.

If the commissioner shall find that—

(a) the proposed change of location is in the public interest, and

(b) will be of benefit to the area to which it is proposed to remove such office, and

(c) that the removal of such office will not result in undue injury to any other association or Federal association in the area to which it is proposed to remove such office, and

(d) the association will have a reasonable prospect of success in the proposed new location, he shall approve such application.

The commissioner may, in his discretion, dispense with such hearing in the event that (a) there is no association located in the municipality in which the applicant association intends to locate its office or (b) all associations in such municipality consent thereto in writing." (Emphasis supplied.)

In the absence of a specified procedure to be followed on applications for the approval of the Commissioner, *section 99 of the Savings and Loan Act, supra,* as amended by *L.* 1953, *c.* 17, *p.* 200, *sec.* 66, *N. J. S. A.* 17:12A–99 provides:

"(4) *Applications for commissioner's approval.* In all cases where the commissioner's approval is required and no procedure for obtaining the same is specified, application therefor shall be made in writing and *the commissioner shall,* within thirty days after receipt of such application, *give written notice* to the association either approving such application, when the same may be properly disposed of *ex parte,* or *designating a time and place when and where the, commissioner will afford, to the association and to any party in interest who requests it, an opportunity to be heard.* The commissioner may grant reasonable adjournments of such hearing. Within thirty days after such hearing, or after the date designated therefor, if no one appears to be heard, the commissioner shall give written notice to the association of his determination, which notice shall state the reasons therefor, if the application is denied.

If the commissioner fails to give any such notice within the time prescribed therefor, such failure shall be construed as his approval of such application." (Emphasis supplied.)

The same section of the act expressly gives a right to a review of the Commissioner's determination:

"(1) *Review of commissioner's determination.* Except as herein otherwise provided, *any association or member aggrieved by any determination,* decision or order of the commissioner or by any failure of the commissioner to make any such determination, decision or order, may, within thirty days thereafter, institute an action in the Superior Court for a review thereof. The court may proceed in the action in a summary manner or otherwise. It shall determine *de novo* all questions, both of fact and of law, touching upon the legality and the reasonableness of such determination, decision or order, and render such judgment and make such orders as shall be equitable and just." (Emphasis supplied.)

## I.

The question of standing to seek judicial review of official action must first be considered. It should not be confused with the right to be heard initially on the subject of the determination of the administrative agency; matters germane to the right to be heard are discussed later in this opinion. We are here concerned solely with the question of the status of the appellants to call on the courts to *review* the propriety of the Commissioner's approval of the application of Colonial to establish a branch office in the manner provided under section 21, *subd. B.*

We start with the basic principle that an administrative officer is a creature of legislation who must act only within the bounds of the authority delegated to him, and that the courts in the exercise of their judicial power are permitted to review the ultimate application of the law which has been entrusted to the administrative officer when necessary for the protection of the rights of persons or property against an abuse of the power delegated, 3 Sutherland, *Statutory Construction, chapter* 66. "The responsibility of determining the limits of statutory grants of authority in such instances," says Mr. Justice Reed in *Stark v. Wickard,* 321 *U. S.* 288, 310, 64 *S. Ct.* 559, 571, 88 *L. Ed.* 733, 738 (1944), "is a judicial function entrusted to the Courts * * *." We condition the right to invoke the judicial power, however, by the requirement that there be some interest to be protected beyond a mere abstraction; but yet, in cases involving substantial public interest, the courts have held that "but slight private interest, added to and harmonizing with the public interest" is sufficient to give standing, *Hudson Bergen, etc., Ass'n v. Board of Com'rs of City of Hoboken,* 135 *N. J. L.* 502, 510 (*E. & A.* 1947); *Greenspan v. Division of Alcoholic Beverage Control,* 12 *N. J.* 456, 459 (1953); *Al Walker, Inc. v. Borough of Stanhope,* 23 *N. J.* 657 (March 25, 1957). Moreover, this right to seek judicial review of administrative decisions inheres not only in those who are direct parties to the initial proceedings

before an administrative agency (a fact which is here recognized and expressed in the act, *N. J. S. A.* 17:12A–99(1)) but also belongs to all persons who are directly affected by and aggrieved as a result of the particular action sought to be brought before the courts for review. In *Carls v. Civil Service Commission of New Jersey,* 17 *N. J.* 215 (1955), where examiners in the Department of Banking and Insurance were reclassified by the Civil Service Commission, the court, while disposing of the meritorious issue against the plaintiffs' contentions, recognized that they had standing to challenge the Commission's action. There the court said:

"Our rules governing procedure in lieu of prerogative writs contain comprehensive provisions which are well designed to afford simple and expeditious modes of reviewing determinations by state administrative agencies such as the Civil Service Commission. * * *
The Commission's action clearly fell within the broad orbit of *Rule* 3:81 (now *R. R.* 4:88) which prescribed the simplest and most effective available mode for its judicial review;" (17 *N. J.,* at *pages* 218, 219).

In the recent case of *Al Walker, Inc., v. Borough of Stanhope, supra,* 23 *N. J.* 657 (March 25, 1957), where a dealer in trailer homes who was not a property owner or even a resident of the Borough of Stanhope was held to have standing to maintain an action in lieu of prerogative writ attacking the validity of an ordinance restricting the use of trailers as residences, we said:

"Unlike the Federal Constitution, there is no express language in our State Constitution which may be said to confine the exercise of our judicial power to actual cases and controversies. * * *
In passing upon a plaintiff's standing the court is properly required to balance conflicting considerations and weigh questions of remoteness and degree."

Early in our judicial history the courts of this State in almost every respect took a more liberal view of the province of the prerogative writ of *certiorari* than the courts of any other state, *Goodnow, "The Writ of Certiorari,"* 6 *Pol. Sc. Q.* 493, 510, 526 (1891). New Jersey courts extended the scope of *certiorari* far beyond its limited use

at common law to review judicial acts, so as to include *quasi*-judicial, *quasi*-legislative, administrative and municipal action. Notwithstanding this liberal tradition, this form of protecton against improper official action was further broadened by the *Constitution of 1947, Art. VI, Sec. V, par. 4*, to make its relief available as a matter of right and not only as a matter of discretion, *Ward v. Keenan, 3 N. J. 298, 302-309 (1949)*.

The respondent Colonial urges that the appellants have no standing to initiate review proceedings because they "have nothing more to serve in their objection to the Commissioner's determination than their own self-interest." "They are merely competitors," it says, and as such "have neither a direct and certainly not a substantial interest in the Commissioner's Order."

But it may very well be that the establishment of a new branch at the location in question will substantially prejudice the existing banking institutions, with resulting adverse effects upon the public in general through other similar institutions in the area. For, if one banking institution should fail in the community as the result of an ill-advised burdening of the existing competitive environment, other financial institutions do not continue unaffected. Some elements of public distrust and lack of faith are inevitably transmitted to them, *cf. Delaware County National Bank v. Campbell, 378 Pa. 311, 106 A. 2d 416 (Sup. Ct. 1954)*. Many will still remember the unfortunate incidents attaching to the granting of some charters in the boom days of a quarter of a century ago. Competing banking institutions may be the only persons with sufficient private interest in harmony with the public concern for the safety of savings and bank deposits to bring the attention of the courts to errors of law in an administrative action granting a license to establish a branch contrary to the standards set by the statute delegating authority to so act. If such banking institutions do not have the necessary standing, who then is there who can or will challenge an administrative decision favorable to the applicant? Without standing in

the appellants to invoke the power of judicial review, the Commissioner's action favorable to Colonial, right or wrong, proper or arbitrary, takes on a conclusive character to the possible great detriment of the people as a whole.

As stated in 9 *Administrative Law Bulletin*, 122 (March, 1957) by Professor Bernard Schwartz, its editor, in critically reviewing *Home Gas Co. v. Federal Power Commission*, 97 *U. S. App. D. C.* 300, 231 *F. 2d* 253 (*D. C. Ct. App.* 1956) as one of the authorities taking a narrow approach to the question of standing:

"* * * there is a tendency in the opinion to confuse the question of whether petitioner is aggrieved (*i. e.*, the question of standing) with that of whether it is entitled to prevail on the merits. Insofar as the court holds that petitioner is not aggrieved by the grant of a license to a competitor, its decision is both unreal and contrary to much of the case-law. It is recognized that there are cases denying the standing of a competitor. See, *e. g.*, 8 *Ad. L. Bull.* 75. To hold that a competitor is not aggrieved in such a case is, however, to rely on the kind of formalistic fiction that has so often brought the law into disrepute.

* * * * * * * *

The courts, in holding, as they sometimes do, that someone like a competitor or a consumer has no standing, have lost sight of the overriding need in our system—to make sure that someone shall in fact be able to secure review of administrative action. It is only if this need is satisfied that the principle of administrative legality can truly be enforced. It is in the interest of the community as a whole that illegal agency action be not left untouched. It is for the judiciary to vindicate this interest by ensuring that there are no unnecessary obstacles in the path of those seeking to challenge 'the legality of administrative action. To construe the standing requirement as our courts sometimes do is to place an unnecessary obstruction on the road of justice."

See also *Atchison, Topeka & Santa Fe Ry. Co. v. Summerfield*, 97 *U. S. App. D. C.* 203, 229 *F. 2d* 777 (*D. C. Ct. App.* 1955); *Granik v. Federal Communications Commission*, 98 *U. S. App. D. C.* 247, 234 *F. 2d* 682 (*D. C. Ct. App.* 1956); *City of Pittsburgh v. Federal Power Commission*, 99 *U. S. App. D. C.* 113, 237 *F. 2d* 741 (*D. C. Ct. App.* 1956).

Moreover, had the Commissioner refused to hear the appellants, his action would unquestionably be reviewable by

this court, *R. R.* 4:88–8. His action is no less reviewable because he permitted them to be heard.

The appellants have demonstrated sufficient interest in the action which they challenge to have standing to maintain this action for review, *Al Walker, Inc., v. Borough of Stanhope, supra,* 23 *N. J.* 657 (March 25, 1957); *Neiden Bar and Grill v. Municipal Bd., etc., of the City of Newark,* 40 *N. J. Super.* 24 (*App. Div.* 1956); *Florence Methodist Church v. Township Committee of Florence Township,* 38 *N. J. Super.* 85 (*App. Div.* 1955). Even though that interest be slight, when coupled with the substantial public interest here involved, it removes their endeavor from the realm of a mere attempt to vindicate a general public interest in maintaining the rule of law, and gives them standing to invoke the judicial power of review, *Greenspan v. Division of Alcoholic Beverage Control, supra,* 12 *N. J.* 456 (1953); *Hudson Bergen, etc., Ass'n v. Board of Com'rs of City of Hoboken, supra,* 135 *N. J. L.* 502 (*E. & A.* 1947).

The banking laws are regulatory in nature, enacted for the protection of the public, and are in no way designed to give exclusive benefits to institutions who have been granted license to conduct the business of banking. But if the appellants are denied status to check an abusive act of the Commissioner, the interest of the public sought to be protected may suffer. No matter of such importance to the economic welfare of the community and the interest of the public generally should be insulated from judicial review. There are, of course, areas of unregulated discretion, but they exist only with respect to minor matters, *Freund, The Police Power, section* 644 (1904), and *Freund, Administrative Powers Over Persons and Property, section* 49 (1928). Matters of such far-reaching importance as banking facilities in many locations fall into an entirely different category and it is unthinkable that any public official should be given unreviewable discretion to grant or deny relief in these matters.

We are not unaware that our decision here appears to conflict with *Public Service, etc., Transp. v. Newark-Eliza-*

*beth, etc., Ass'n,* 3 *N. J.* 118 (1949), where this court held that competitors of the Public Service Coordinated Transport had no standing to attack the constitutionality of a statute under which the Board of Public Utility Commissioners were empowered to approve the substitution of autobuses on any line where trolley buses had previously been authorized or to question the action taken thereunder. That case presents a factual situation altogether different from the one confronting us here. While the fact that the parties were mere competitors was there looked upon as making them strangers to the action taken, the majority of the court undertook to point out that:

"The record discloses no evidence that the appellants have been or will be adversely affected, or that any usurpation or trespass upon their rights has resulted or will result *in futuro* as a consequence of the challenged statute and proceedings thereunder. The uncontroverted evidence shows that respondent Public Service Coordinated Transport, has been authorized to substitute 35 autobuses for a similar number of trolley buses in its operation over the route in question. It is true that respondent's bus line runs parallel with the bus lines of the appellants over a part of the route, but that condition previously existed and has not been changed by the challenged proceedings. It does not appear how the substitution of the same number of autobuses for trolley buses, operating over exactly the same route, could have an adverse effect upon the existing business of the appellants. The absence of proof of real injury has been held to be fatal to one endeavoring to attack the validity of an enactment. *Bowers v. [Board of Chosen Freeholders] Middlesex County,* 127 *N. J. L.* 471 *(Sup. Ct.* 1941)."

In that case, while there may have been some slight private interest in the action, there was not the slightest public interest to harmonize with it. The practical effect of that decision, however, was to grant standing to the competitors, because the court disposed of the issues with respect to constitutionality of the statute on the merits.

## II.

This brings us to a consideration of the second question, relating to the hearing before the Commissioner.

As pointed out above, a competitor may in the public interest attack the administrative action here involved. As such, a competitor may urge the question whether the Commissioner's action exceeded his power or constituted an arbitrary exercise of it. The objecting institutions, however, urge they are entitled to notice of hearing and the status of a party to the proceeding with the broader review which that status would afford. There is no constitutional basis for this further claim; if it exists, it is only because of a statutory provision for it.

It is urged that subsection B of section 21, *N. J. S. A.* 17:12A–21, *supra,* involves the same policy matters with which subsections A and C are concerned and hence we should read into subsection B the same notice and hearing provision which appears in subsections A and C. We need not consider the nature of the hearing which the latter subsections require. It is provided with respect to them that "The commissioner shall conduct such investigation or hearing or both, as he may deem to be advisable." Assuming the cited provision has the full import the objecting institutions attribute to it, yet we cannot conclude the Legislature intended it to apply to subsection B notwithstanding the patent omission of it. Subsection B plainly excludes "any of the other provisions or limitations of this section."

Nor are the objecting institutions aided by *N. J. S. A.* 17:12A–99 (4), for excluded from its purview is any application which "may be properly disposed of *ex parte*" and an application under subsection B falls within the exclusion.

The practical problem here presented is how the objecting institutions may bring before the reviewing court the entire record upon which the Commissioner acted to the end that the issue of excess or arbitrary exercise of power may be reviewed. These institutions were free to apply for an order for disposition under *R. R.* 4:88–9 and upon that application an order might appropriately have been made directing the further record to be made before the Commissioner himself, *Bailey v. Council of the Div. of Planning,*

*etc., State of New Jersey,* 22 *N. J.* 366 (1956), *cf. Family Finance Corp. v. Gough,* 10 *N. J. Super.* 13, 25–26 (*App. Div.* 1950). It may be observed that since upon review the matter would be handled as just indicated, the course of litigation would be expedited if the Commissioner permitted all appearing objectors to be heard fully in the first instance, not because they are entitled to the status of parties to the proceeding before him, but because upon the attack they can make, they will ultimately be accorded the same opportunity to attack the sufficiency of the proof under the standard of review described above.

The objecting institutions were not given full opportunity to inquire into the essential facts of the petition made by Colonial. The record indicates that "considerable information" was supplied to the Department by Colonial *ex parte* and not disclosed to the objectors. Furthermore, the proceedings indicate that the Commissioner relied in his determination on factual material in the files of his department and developed specifically for the purpose of deciding the pending application of Colonial, without divulging the substance of his material and giving the objectors the opportunity to explore it.

The determination of the Commissioner cannot be made to rest upon information outside the record in the case before him which the parties have not had the opportunity to meet. This principle of exclusiveness of the record was discussed in *Mazza v. Cavicchia,* 15 *N. J.* 498 (1954) and was held there to be established law in this state. We said in that case, 15 *N. J.,* at *page* 514:

"In any proceeding that is judicial in nature, whether in a court or in an administrative agency, the process of decision must be governed by the basic principle of the exclusiveness of the record. 'Where a hearing is prescribed by statute, nothing must be taken into account by the administrative tribunal in arriving at its determination that has not been introduced in some manner into the record of the hearing.' *Benjamin, Administrative Adjudication in New York,* 207 (1942). Unless this principle is observed, the right to a hearing itself becomes meaningless. Of what real worth is the right to present evidence and to argue its significance at a formal hearing, if the one who decides the case may stray at will

from the record in reaching his decision? Or consult another's findings of fact, or conclusions of law, or recommendations, or even hold conferences with him?"

Beyond question the use of expert knowledge gained by the Department is a desirable attribute of the administrative process, but it need not be applied in a manner which is unfair. By taking appropriate official notice of such material and making such facts part of the record and giving the parties fair opportunity to meet, explain or refute it, the Commissioner can satisfy the requirements of fairness and adequately protect the interests of all concerned. As stated in *Pennsylvania Railroad Co. v. Department of Public Utilities*, 14 *N. J.* 411, 427 (1954):

"In this fashion the board may stay within the record and rest thereon its order accompanied by adequate findings which determine the basic facts and the conclusions therefrom. In recent years this court has been called upon frequently to point out that such findings are of the utmost importance not only in insuring a responsible and just determination by the board but also in according a proper basis for the judicial review which is expressly afforded by statute and rules."

## III.

Turning to the final question, relating to the propriety of the Commissioner's action, it has been argued that under subsection B of section 21 the Commissioner has no authority to approve the establishment of a branch office of Colonial at a location outside the immediate area in which the principal office of Excelsior is located, and that therefore the application must be dismissed without regard to any deficiencies in the proceedings. But we must assume that the over-all purpose and policy of the Savings and Loan Act, *supra*, *L.* 1946, *c.* 56, as amended, *N. J. S. A.* 17:12A–1 *et seq.*, was to provide a consistent pattern of control and that what is not capable of accomplishment under one section will not be capable of accomplishment indirectly under some other section. Component parts of the act cannot be isolated and construed in a vacuum, for to do so distorts their true meaning and fosters results not contemplated by the enact-

ment, *Horwitz v. Reichenstein,* 15 *N. J.* 6, 8 (1954), 2 *Sutherland, Statutory Construction* (*3d ed.*), sections 4703–4. Under the construction of subsection B espoused by the plaintiffs, what they claim the Commissioner was powerless to do could be easily accomplished by combining a change of location by Excelsior from 715 Elizabeth Avenue to a new location in the immediate area of 29 Broad Street under the authority of *N. J. S. A.* 17:12A–24 and without the necessity of approval by the Commissioner, with an application by Colonial under subsection B to establish such new office of Excelsior or a "suitable substitute" as a branch. It is axiomatic that constructions calling for unreasonable results will be avoided where reasonable results consistent with the indicated purpose of the act as a whole are equally possible, *Pine v. Okzewski,* 112 *N. J. L.* 429, 433 (*E. & A.* 1933); *State v. Clark,* 29 *N. J. L.* 96, 99 (*Sup. Ct.* 1860). Certainly, it could not have been intended to withhold from the Commissioner the authority to approve a substitute location for the proposed branch office of Colonial in a different part of Elizabeth, but give him authority to approve, in effect, the same application made after a change in location by Excelsior. We can but conclude that there is no merit to this assertion of lack of authority.

 Judicial review of the substantive propriety of the Commissioner's determination should only be undertaken on a complete record, *Bailey v. Council of the Div. of Planning, etc., State of New Jersey, supra,* 22 *N. J.* 366, 374–375 (1956). Since the objectors were denied appropriate contact with the record, fairness dictates that they be given that opportunity, *Mazza v. Cavicchia, supra,* 15 *N. J.* 498 (1954); *Family Finance Corp. v. Gough, supra,* 10 *N. J. Super.* 13, 25–26 (*App. Div.* 1950).

 The objecting institutions here misconceived the nature and scope of the review to which they are entitled. On appeal they have the burden of overcoming the presumption of reasonableness which attaches to the Commissioner's action, *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504, 523 (*E. & A.* 1935), *Dutcher v. Depart-*

*ment of Civil Service,* 7 *N. J. Super.* 156, 162 *(App. Div.* 1950). In the interest of justice, therefore, the cause will be returned to the Commissioner for completion of the record and such further findings and determination as the Commissioner may make. Remanded.

BURLING, J. (dissenting). The Colonial Savings and Loan Association of Roselle Park has contracted to purchase the assets of the Excelsior Building and Loan Association of Elizabeth. Performance is conditioned upon the approval of the Commissioner of Banking and Insurance of the establishment of a branch office by Colonial in Elizabeth in an entirely different area of that city than where the Excelsior office has been doing business for 25 years. Colonial applied to the Commissioner for approval pursuant to *N. J. S. A.* 17:12A–21, *subd. B* which provides:

"Notwithstanding any of the other provisions or limitations of this section, any association into which another association has been merged or which has acquired, by purchase, reorganization, or in any other manner, all or a substantial portion of the assets of another association, may, with the permission of the commissioner, and under such terms and conditions as he may prescribe, *maintain the office previously maintained by such other association, or a suitable substitute therefor, as a branch office; provided, however, that the commissioner shall first determine that the maintenance of such branch is in the public interest and will be of benefit to the area served by such branch and to the members of the association."* (Emphasis supplied.)

I deem it unnecessary to determine whether the competing institutions are entitled to a full hearing as the majority holds, for as I view the facts of the instant case and the applicable law, the Commissioner has no statutory authority to grant Colonial's application for a branch office at a location completely divorced from the immediate area where the Excelsior office is presently maintained in Elizabeth.

In all situations where a hearing is *expressly* required (which would exclude subsection B) the Commissioner is obliged to determine, as a condition precedent to the approval of the application, that the proposed office "will not result in undue injury to any other association or Federal associa-

tion in the area" where it is proposed to locate the office. This finding must precede the approval of (1) a new savings and loan association (*N. J. S. A.* 17:12A–16.1); (2) the independent establishment of a branch office in the same municipality as the principal office is located (*N. J. S. A.* 17:12A–21, *subd. A*); (3) the independent establishment of a branch office in another municipality of the same county wherein the principal office is located (*N. J. S. A.* 17:12A–21, *subd A*) (in this situation a branch may not be established where a principal or branch office of another association is already operating in the municipality, but offices outside the municipality and not more than five miles distant from the *situs* of the proposed branch are recognized as parties in interest); (4) where a principal office is removed from one municipality to another (*N. J. S. A.* 17:12A–24); (5) where a branch office is moved from one location to another (*N. J. S. A.* 17:12A–21, *subd. C*) (subsection C incorporates the procedural and substantive requirements of subsection A).

Significantly, subsection B *omits* the required finding of an absence of "undue injury" and only requires "that the commissioner shall first determine that the maintenance of such branch is in the public interest and will be of benefit to the area served by such branch and to the members of the association."

Geographic location within the municipality is a major factor in the competitive combat between savings and loan associations. Practical proof of this observation is found in the instant case where Colonial seeks a more strategic competitive *situs,* nearly a mile from the location of Excelsior's present headquarters. Statutory cognizance of this significant factor is evidenced by the agency determination of absence of "undue injury" to other associations in the area which is required in all instances of new offices established or old offices relocated, except under subsection B and also where a *principal* office is relocated within the same municipality (*N. J. S. A.* 17:12A–24). Where a finding of "undue injury" is required to be made it clearly anticipates

that other associations maintaining offices in the immediate area are to be recognized as parties in interest.

There was a calculated intention on the part of the Legislature in omitting this required finding in subsection B. That section permits an association which merges with or acquires the assets of another to "maintain the office previously maintained by such other association, or a suitable substitute therefor, as a branch office," upon approval of the Commissioner. The meaning of the omission is appreciated if it once be acknowledged that subsection B anticipates a branch office conducted at the same locational *situs* as the previous office, and "suitable substitute" connotes no more than a branch office in the same immediate area as the office formerly maintained. If so construed it is clear that competitive associations have no recognized interest in the operation of a branch office in the same immediate area where another office was formerly maintained. The *status quo ante* is unchanged.

The legislative history of the treatment accorded branch offices bears out the restrictive interpretation advanced. The initial statutory treatment (accorded generally to savings and loan associations) was merely "An act to encourage the establishment of mutual loan and building associations," enacted February 28, 1849 (*Laws of* 1849, *p.* 227). By 1903 the need for comprehensive regulatory legislation (*Warren, New Jersey Building and Loan History, Records* —1936) resulted in *L.* 1903, *c.* 218. *Section* 16 of that enactment prohibited the establishment of branch offices. The prohibition was continued in 1925 by a further comprehensive enactment which displaced the 1903 legislation. *L.* 1925, *c.* 65, *sec.* 17. Indeed, not until 1952 was the prohibition against the independent establishment of branch offices removed, *L.* 1952, *c.* 204, *sec.* 1, and even then it was strictly circumscribed. *N. J. S. A.* 17:12A–21, *subd. A.*

The first merger provision (which would be the statutory antecedent of the present subsection B, *N. J. S. A.* 17:12A–21, *subd. B*) appears in *L.* 1932, *c.* 94, *sec.* 1, and this provided that a branch office might be conducted for a period "not to exceed two years" "in the *place or places* in which the affairs

of such merging or consolidating association * * * has been conducted." The Commissioner's approval was required. By *L.* 1942, *c.* 163, *sec.* 1, the time limitation was removed, but there is no persuading indication that the branch office arising from the merger might be located other than where the affairs of the former association had been conducted. The descriptive phrase "suitable substitute" first appeared in *L.* 1946, *c.* 56, *sec.* 21, and by the parity of reasoning advanced heretofore it cannot be persuasively contended that this phrase contemplates the relocation into an entirely new area which Colonial seeks here.

The legislative policy is clear. Branch offices are not to be established at random. The aim is to hit the evil at its source and the legislative endeavor must be construed in this light. *Lynch v. Borough of Edgewater,* 8 *N. J.* 279, 286 (1951). And once the purpose and design is recognized the statute should not be construed to permit a subversion of the policy, *Grogan v. DeSapio,* 11 *N. J.* 308, 322 (1953), either directly or indirectly. In the instant situation Excelsior was selling out. It had no intention whatever of changing its principal office to a new area of the city to continue or enlarge its operation. There was no apparent justification in view of the small size of the association for it to incur obligations of considerably enlarged rental charges incident to the central business portion of the city, and furnishings and embellishments of quarters appropriate thereto for full-time operation. The contract of purchase itself provided that if the purchaser Colonial so directed, Excelsior was to cause a transfer of its principal office to a location selected by Colonial. Thereafter Excelsior would pass out of existence; Colonial would have a branch office.

I would reverse the agency determination and direct a dismissal of the application.

*For remandment*—Chief Justice VANDERBILT, and Justices OLIPHANT, JACOBS and WEINTRAUB—4.

*For affirmance*—Justices HEHER and WACHENFELD—2.

*For reversal*—Justice BURLING—1.