244 N.J. Super. 426 (1990)
582 A.2d 1018
IN RE WATERFRONT DEVELOPMENT PERMIT NO. WD88-0443-1, LINCOLN HARBOR FINAL DEVELOPMENT, WEEHAWKEN, HUDSON COUNTY.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1990.
Decided November 13, 1990.
*427 Before Judges ANTELL, O'BRIEN and KEEFE.
Gordon N. Litwin argued the cause for appellant American Littoral Society (Kenney, Kenney, Gross & McDonough, attorneys; Gordon N. Litwin and Linda B. Kenney, of counsel and on the brief).
Kathe M. Mullally, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Kathe M. Mullally, on the brief).
Daniel E. Horgan argued the cause for intervenor Hartz Mountain Industries, Inc. (Waters, McPherson, McNeill, attorneys; Daniel E. Horgan, of counsel; Lisa A. Ciaston and Mark O. Norell, on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
On April 11, 1989, the Commissioner of the Department of Environmental Protection (hereinafter "DEP") issued a Waterfront *428 Development Permit to Hartz Mountain Industries, Inc. (hereinafter "Hartz Mountain") to complete the final build out stage of Lincoln Harbor along the Hudson River in Weehawken. The action of the Commissioner is challenged by the American Littoral Society (hereinafter "ALS") on the ground that the Commissioner breached his own department's regulations by personally displacing the Division of Coastal Resources (hereinafter "Division") to whom the power of issuing waterfront permits is confided by N.J.A.C. 7:7-1.5(a). Central to the appeal is ALS's dissatisfaction with those conditions of the permit which allow construction of the project so as to obscure the scenic view of the Hudson River and New York City skyline from the Lincoln Tunnel Helix[1] and from Gregory Avenue and Paterson Plank Road in Weehawken.
ALS is a non-profit corporation formed primarily to encourage the study and conservation of marine life, especially in the coastal zone. It claims to have about 8000 members, about 3500 of whom reside in New Jersey. It also claims to have been active with regard to issues involving access, both physical and visual, to coastal areas.
The project for which the permit was issued is a mixed use office, retail, hotel and residential complex within the waterfront area brought under regulation by N.J.S.A. 12:5-3. The entire site covers 93.317 acres extending along approximately 3700 linear feet of Hudson River shoreline. The permit allows construction of 1,044,176 square feet of office space, 44,437 square feet of retail space, 332 hotel rooms and 55 residential units. The full build out, including previously approved applications, would comprise 2,202,316 square feet of office space, 99,324 square feet of retail and restaurant space, 332 hotel units, a 250 slip marina and 300 units of housing. Impairment of the view would be caused by the presence of two 160-foot *429 high buildings. The vista, which has been described as "spectacular," is now enjoyed by hundreds of thousands of bus and car passengers each day. Although portions of the view will remain intact if the project proceeds as planned, it appears that its panoramic beauty will be substantially lost  except to the commercial tenants of the two towers.
N.J.S.A. 12:5-3 provides that all plans for waterfront development must be submitted to DEP and that no such improvements may be implemented without that department's approval. By regulation, DEP has prescribed that no regulated activity may be undertaken without a permit issued by the "Division." N.J.A.C. 7:7-1.5(a). "Division" is defined by N.J.A.C. 7:7-1.3 to mean the Division of Coastal Resources in the Department of Environmental Protection. There can be no doubt about DEP's intention to delegate the permit-issuing function to the Division. N.J.A.C. 7:7-4.5 speaks of public hearings to be held before the "Division." N.J.A.C. 7:7-4.4 speaks of the "Division" making an initial review of applications. N.J.A.C. 7:7-4.7 prescribes the timetable within which the "Division" must act on development applications. Involvement of the "Commissioner," as distinguished from the "Division," comes about only after an appeal is taken by an interested person aggrieved by any final action of the Division. N.J.A.C. 7:7-5.1. Where appeals are granted the Commissioner must refer them to the Office of Administrative Law for a fact-finding hearing pursuant to the Administrative Procedure Act "after which the Commissioner will make a final decision." N.J.A.C. 7:7-5.3(d).
The subject of scenic resources and design policy is specifically addressed by the regulations. N.J.A.C. 7:7E-8.12(c) provides:
New coastal development that is visually compatible with its surroundings in terms of building and site design, and enhances scenic resources is encouraged. New coastal development that is not visually compatible with existing scenic resources in terms of largescale elements of building and site design is discouraged.
*430 "Scenic resources" are defined to include "views of the natural and/or built landscape." N.J.A.C. 7:7E-8.12(a). High rise structures, those that are more than 6 stories or more than 60 feet from existing preconstruction ground level, may be acceptable under N.J.A.C. 7:7E-7.14(a), but "[t]he proposed structure must not block the view of dunes, beaches, horizons, skylines, rivers, inlets, bays, or oceans that are currently enjoyed from existing residential structures, public roads or pathways, to the maximum extent practicable." N.J.A.C. 7:7E-7.14(a)3.
The project's impact on the area has provoked controversy, and a public hearing was held before the Division on January 11, 1989, at the Weehawken Municipal Building. It was attended by approximately 125 people, of whom 42 gave testimony, and the Division received approximately 170 letters commenting on the application. In general, the comments given in support of the project cited the municipal need for an improved tax base and respect for the local planning process. They urged that protection of the scenic view was not as important as acquiring needed tax ratables and that the local planning process had already provided at least partial protection for the views.
Opponents of the project cited loss of the views from the Lincoln Tunnel Helix, from Gregory Avenue and Paterson Plank Road, increased air pollution, increased traffic congestion and inadequate wastewater treatment as reasons for their opposition.
At some point between the date of hearing and the date the Commissioner issued the permit the Division prepared a detailed and comprehensive draft decision dated April 11, 1989, in which it concluded that the permit should be denied. In doing so, it took account of the fact that the view could be effectively protected by the design alternative of reducing the height of the buildings from the 160 feet proposed to an estimated 85 feet. Recognizing that this would entail the loss of an estimated 485,425 gross square feet from what was contemplated by the proposed design, the Division found "that the view enjoyed *431 by millions is significant to the Hudson River waterfront region and the State of New Jersey as a whole, and that that significance outweighs the economic impacts to Hartz Mountain Industries and the Township of Weehawken of losing 485,425 square feet of office space." It added that other building design changes could be further analyzed so as to protect the view with a lesser reduction in square footage.
The draft decision of the Division was never effectuated. Instead, for reasons that do not appear in the record, the Commissioner intervened to order issuance of the permit. He did so pursuant to his own written opinion in which he found that although the proposed design would block part of the view, the costs of the redesign discussed in the Division's opinion "would far outweigh the benefits derived" from what he described as this "momentary glimpse" of the view. He also stated, with respect to reducing the height of the two buildings, "that the economic and architectural consequences would be unacceptable in that such a change would significantly reduce the viability of the project."
Explanations as to how the Commissioner reached his conclusion that the redesign would "significantly reduce the viability of the project" were not offered. Pertinent, in this connection, is the letter Hartz Mountain wrote to DEP following the hearing of January 11, 1989. It there stated that the redesign would deprive the southern side of one of the buildings of the attractive water view, "thus reducing marketability and reducing views for workers who will spend their entire days at Lincoln Harbor." In addition to having the Commissioner's findings as to underlying economic facts and figures relevant to viability, it would be useful to know, for example, whether, and just how, the Commissioner weighed Hartz Mountain's appropriation of the unobstructed majestic spectacle for the sole enjoyment of its commercial tenants when he made his determination that the original proposed design protected the public view "to the maximum extent practicable." N.J.A.C. 7:7E-7.14(a)3.
*432 In determining the validity of agency action taken in violation of its own rules of procedure it is necessary to distinguish between interpretative and legislative rules. "A legislative rule is the product of an exercise of delegated legislative power to make law through rules. An interpretative rule is any rule an agency issues without exercising delegated legislative power to make laws through rules." 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 7:8, at 36 (2d ed. 1979 & Supp. 1989). "A legislative rule is clearly binding on the agency that issues it." Id. § 7:21, at 98 of Supp. "Legislative rules bind agencies, and interpretative rules sometimes do." [citations omitted] Id. at 250 of Main Vol. "Agencies must follow their own procedural rules." Id. "The idea that legislative rules are binding on the issuing agency is deeply embedded." Id. at 98 of Supp.
The facts of United States of America ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) are analogous. There, a deportable alien appealed from an order by the Board of Immigration Appeals denying his application for suspension of deportation. The procedure to be followed in processing such an application was prescribed by regulation of the Attorney General acting under the Immigration Act. It called for decisions at three separate administrative levels below the Attorney General: by a hearing officer, by the Commissioner and by the Board of Immigration Appeals. The Board was appointed by the Attorney General and was required to operate under a regulation which provided that in considering appeals it
"`shall exercise such discretion and power conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case. The decision of the Board ... shall be final except in those cases reviewed by the Attorney General....'" Id. at 266, 74 S.Ct. at 503, 98 L.Ed. at 686 (quoting 8 C.F.R. § 90.3(c)(1949)).
On appeal the alien argued that the Attorney General had impaired the right to an impartial hearing before the Board of Immigration Appeals by circulating to the Board a confidential list of "unsavory characters" whom the Attorney General wanted deported. Id. at 267, 74 S.Ct. at 503, 98 L.Ed. at 686.
*433 In reversing the Board's order, the Supreme Court found that the Attorney General had wrongly influenced the outcome of the proceeding and stated that the regulations conferred upon the Board a grant of discretionary authority as broad as that conferred upon the Attorney General by the Immigration Act under which the proceeding was held. This carried with it an obligation on the part of the Board to exercise its authority according to its own understanding and conscience. "In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner." Id., at 267, 74 S.Ct. at 503, 98 L.Ed. at 686.
In United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, (1974) the subject of the appeal was a subpoena duces tecum issued to the President of the United States, requiring him to produce for use at a pending criminal trial certain tape recordings and documents. The President contested the subpoena on the ground that the material sought was protected by his executive privilege against disclosure of confidential communications. The prosecution was being conducted by a Special Prosecutor appointed by the Attorney General, and the regulation by which the appointment was made expressly gave the Special Prosecutor authority to contest the invocation of executive privilege for the purpose of pursuing the criminal action. The President challenged that grant of authority.
Citing United States ex rel. Accardi v. Shaughnessy, supra, the Supreme Court noted that "[s]o long as this regulation is extant it has the force of law." Nixon, 418 U.S. at 695, 94 S.Ct. at 3100, 41 L.Ed.2d at 1057. It characterized Accardi as holding "that so long as the Attorney General's regulations remained operative, he denied himself the authority to exercise the discretion delegated to the Board even though the original authority was his and he could reassert it by amending the regulations." Id. at 696, 94 S.Ct. at 3101, 41 L.Ed.2d at 1057 (citing Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 *434 L.Ed.2d 1012 (1959)). The Court then proceeded to resolve the question whether the issue presented constituted a mere "intrabranch dispute" or whether it was a justiciable controversy:
Here, as in Accardi, it is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor's authority. But he has not done so. So long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it.
Ibid.
The principle was summarized in Pacific Molasses Company v. F.T.C., 356 F.2d 386 (5th Cir.1966) in the following way:
When an Administrative Agency promulgates rules to govern its proceedings, these rules must be scrupulously observed. See Service v. Dulles, (1957), 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. This is so even when the defined procedures are "* * * generous beyond the requirements that bind such agency * * *." Vitarelli v. Seaton, (1959), 359 U.S. 535, 547, 79 S.C. 968 [976], 3 L.Ed.2d 1012 (Justice Frankfurter dissenting). For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules. United States ex rel. Accardi v. Shaughnessey, (1954), 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681. If an agency in its proceedings violates its rules and prejudice results, any action taken as a result of the proceedings cannot stand.
Id. at 389-390 (citation omitted). See also VanderMolen v. Stetson, 571 F.2d 617, 624 (D.C. Cir.1977); Frisby v. U.S. Dept. of Housing and Urban Development, 755 F.2d 1052, 1055 (3d Cir.1985); Scott v. Heckler, 768 F.2d 172, 178-179 (7th Cir.1985); Black v. I.C.C., 737 F.2d 643, 652 n. 3 (7th Cir.1984); Union of Concerned Scientists v. Nuclear Reg. Com'n, 711 F.2d 370, 381 (D.C. Cir.1983).
Judged by the foregoing standards, because the Commissioner violated his own regulations to grant the waterfront development permit while the application was still pending before the Division of Coastal Resources, the permit must be ruled invalid.
Both Hartz Mountain and DEP argue that, at least implicitly, the Commissioner is statutorily empowered to supersede the Division in issuing permits. They rely specifically upon N.J. *435 S.A. 13:1B-8[2], which provides that the Director of the Division shall work under the "direction and supervision of the commissioner." There is no question about the Commissioner's supervisory power over the Division. But this does not mean he may disregard the regulations promulgated for the management of his own agency.
It is evident that DEP's administrative framework is structured to insure a multi-faceted analysis of permit applications so as to fulfill most effectively DEP's statutory mission to protect the environment. To allow the Commissioner to depart from this carefully thought out program whenever he wishes would simply diminish the integrity of his agency's standards without any corresponding benefit.
The Division was created by statute, N.J.S.A. 13:1B-8. Its Director must be a person qualified by training and experience to direct the work of the Division and is appointed by the Governor with the advice and consent of the Senate. A bureau of such status would not have come into existence had the legislators not intended it to be heard from and for its views to be given serious attention in shaping the decisions of the DEP. Recognizing this, the regulations deliberately distribute the permit approval powers so that, although the Commissioner has appellate jurisdiction, applications are basically handled by the Division, and where appeals therefrom are taken to the Commissioner he must first refer the matter to the Office of Administrative Law for a hearing under the Administrative Procedure Act before he makes a final decision. N.J.A.C. 7:7-1.5(a), 5.3. This carefully tooled system, bringing together as it does the special insights of the Division, the fact-finding skills of the Office of Administrative Law and the expertise of the agency head, greatly reduces the risk of arbitrary action, *436 since the agency head is not free to brush aside or disregard without comment the recommendations and findings of the Office of Administrative Law, Matter of Bergen County Util. Auth., 230 N.J. Super. 411, 416, 553 A.2d 849 (App.Div. 1989); State, Dept. of Health v. Tegnazian, 194 N.J. Super. 435, 449-450, 477 A.2d 363 (App.Div. 1984), appeal after remand, 205 N.J. Super. 160, 500 A.2d 398 (1985); nor, indeed, those of his own staff, In re Valley Hosp., 240 N.J. Super. 301, 310, 573 A.2d 203 (App.Div. 1990). With contributions from these sources the process will tell us, if allowed to perform as it was intended to, not in conclusory terms, but with hard facts, in what way and the extent to which, the costs of redesign do or do not outweigh the public's enjoyment of the view from the Helix and how the economics and architectural consequences will or will not reduce the viability of the project. Because the Commissioner suppressed the normal salutary functioning of DEP's procedural regulations, his action in granting the permit presented for review must be reversed and the permit vacated.
On April 20, 1989, ALS requested a review hearing of the Commissioner's determination pursuant to N.J.A.C. 7:7-5.1. The foregoing regulation allows any "interested person who considers himself aggrieved by a final action of the Division" to request a hearing. The application was denied by letter of June 6, 1989, which expressed DEP's determination that the matter did not constitute a contested case under the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. We agree with that determination. The rule is firmly settled that a trial-type adjudicatory hearing is not allowed in such matters except to an applicant who can show a statutory right or a constitutionally protected property interest. See In re Valley Hosp., 240 N.J. Super. 301, 312, 573 A.2d 203 (App.Div. 1990); Spalt v. New Jersey D.E.P., 237 N.J. Super. 206, 212, 567 A.2d 264 (App.Div. 1989); Normandy Beach v. Environ. Protection Dep't Com'r., 193 N.J. Super. 57, 60-61, 472 A.2d 156 (App.Div. 1983), certif den. 96 N.J. 305, 475 A.2d 596 (1984); Public Interest Research Group v. State, 152 N.J. Super. 191, 205, 377 A.2d 915 (App. *437 Div. 1977), certif. den. 75 N.J. 538, 384 A.2d 517. ALS points to no statutory authority and fails to show any particularized property interest protected by state or federal Constitution that has been impaired by DEP's action.
DEP also questions ALS's standing to pursue the within appeal. The distinction has been recognized between "standing to seek judicial review of official action" and standing to be heard initially within the administrative agency. Elizabeth Federal S. & L. Assn. v. Howell, 24 N.J. 488, 499, 132 A.2d 779 (1957). "[I]n cases involving substantial public interest, the courts have held that `but slight private interest, added to and harmonizing with the public interest' is sufficient to give standing." Ibid. (quoting Hudson Bergen, etc., Ass'n v. Board of Com'rs of City of Hoboken, 135 N.J.L. 502, 510, 52 A.2d 668 (E. & A. 1947) (other citations omitted)).
As the draft opinion of the Division pointed out, there is a conflict in the perspectives of local municipal residents and the travelers who regularly utilize the Helix. For one thing, local residents do not make use of that roadway; they have access into the Lincoln Tunnel directly from local roads and therefore have no interest in preserving the view. The local attitude is understandably colored by the fact that the more square feet of office space that can be placed on the site, the greater will be the tax revenue gained by Weehawken. Whereas the local residents are well organized and vocal in their support of the project as it has been permitted, the people who benefit from the view are not. As the Division draft opinion stated:
The regular commuters, the occasional passengers to New York, and the people just traveling through New Jersey are not likely to attend the public hearing in Weehawken or know that they could have submitted written comments to the DEP. Several hundred of them learned of the proposed development through news articles and have written to express the importance of the view to them. Most of the people who enjoy the view, however, are only likely to learn that it is threatened and to express a sense of outrage when they actually see the backs of office buildings rising in front of the view they have enjoyed.
*438 It is imperative that regional interests be spoken for in this proceeding. If such organizations as ALS do not have the necessary standing,
who then is there who can or will challenge an administrative decision favorable to the applicant? Without standing in the appellants to invoke the power of judicial review, the Commissioner's action favorable to [Hartz Mountain], right or wrong, proper or arbitrary, takes on a conclusive character to the possible great detriment of the people as a whole.
Elizabeth Federal S. & L. Assn. v. Howell, 24 N.J. at 501-502, 132 A.2d 779. We therefore recognize ALS's standing to bring this appeal before us.
The determination of the Commissioner dated April 11, 1989, finding the proposed Lincoln Harbor final development acceptable under the Waterfront Development Act, N.J.S.A. 12:5-3 and approving the issuance of permit # XX-XXXX-X is reversed and the permit vacated. The matter is remanded to DEP for further proceedings consistent with this opinion.
NOTES
[1] The Helix is a roadway that overlooks the Hudson River as it spirals down from the Palisades past the Kings Bluff Promontory to the mouth of the Lincoln Tunnel.
[2] N.J.S.A. 13:1B-7 actually creates the Division of Resource Development. Under N.J.S.A. 13:1D-18.2, however, all statutory references to the Division of Resource Development are to be considered references to the Division of Coastal Resources and its Director.