624 A.2d 14

IN THE MATTER OF: SMB ASSOCIATES (ANCHORING POINT), v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION.

Superior Court of New Jersey
Appellate Division

Argued January 11, 1993—Decided April 23, 1993.

Before Judges LONG, D'ANNUNZIO and KEEFE.

*Gordon N. Litwin* argued the cause for appellants American Littoral Society, D.W. Bennett and Richard Crema (*Ansell, Zaro, Bennett & Kenney,* attorneys).

*Richard M. Hluchan* argued the cause for respondent SMB Associates (*Levin & Hluchan,* attorneys).

*Robert J. Del Tufo,* Attorney General of New Jersey, submitted a Statement in Lieu of Brief for Coastal Area Review Board (*Helene P. Chudzik,* Deputy Attorney General, on the Statement).

*Robert J. Del Tufo,* Attorney General of New Jersey, submitted a supplemental brief (*Mary C. Jacobson,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

At issue is the power of a government agency to waive its regulations.

This appeal involves a mixed-use real estate development proposed by respondent SMB Associates (hereinafter SMB) in Egg Harbor Township in Atlantic County. Specifically, appellants, American Littoral Society, D.W. Bennett and Richard Crema, appeal from a decision of the Coastal Area Review Board (hereinafter CARB), rendered on April 10, 1991, granting "SMB Associates request for a waiver of the Bay Island Corridor Policy" and directing issuance of a permit for the project. The decision shielded the project from the impact of certain regulations adopted by the Department of Environmental Protection to imple-

ment the Coastal Area Facility Review Act (hereinafter CAFRA), *N.J.S.A.* 13:19–1 to –21.

CAFRA prohibits construction of "a facility in the coastal area" without a permit. *N.J.S.A.* 13:19–5. SMB's project is within the "coastal area," *N.J.S.A.* 13:19–4, and constitutes a "facility" subject to CAFRA. *N.J.S.A.* 13:19–3. The Commissioner of the Department of Environmental Protection[1] (Commissioner) may not issue a permit unless he finds that the statutory standards have been met. *N.J.S.A.* 13:19–10. *See generally State, Dep't of Envtl. Protection v. Stavola,* 103 *N.J.* 425, 511 *A.*2d 622 (1986); *Crema v. N.J. Dep't of Envtl. Protection,* 94 *N.J.* 286, 463 *A.*2d 910 (1983); *Matter of Egg Harbor Associates,* 94 *N.J.* 358, 464 *A.*2d 1115 (1983); *Matter of Cape May County Mun. Util. Auth.,* 242 *N.J.Super.* 509, 577 *A.*2d 840 (App.Div.1990). The statute authorizes the DEP "to adopt, amend and repeal rules and regulations to effectuate the purposes of this act." *N.J.S.A.* 13:19–17. Pursuant to its statutory authority, the DEP adopted extensive and detailed regulations implementing CAFRA, *N.J.A.C.* 7:7–1 *et seq.* and *N.J.A.C.* 7:7E–1.1 *et seq.,* including the regulations establishing the bay island corridor policy, *N.J.A.C.* 7:7E–3.24,[2] and the general land area policy, *N.J.A.C.* 7:7E–5.1 *et seq.*

SMB's site consists of 133 acres, much of it wetlands. Its project is to be constructed on 17 upland acres and includes a 200 slip marina, a 200 room motel, a restaurant, retail shops, 69 townhouses, 120 condominium units, and parking for hundreds of automobiles. Access to the project from existing Route 152 would be provided by an elevated roadway to be built across wetlands on 165 pilings. The roadway would be 600 feet long and 25 feet wide. The project's total impervious surface coverage would be 5.63 acres, constituting approximately 33% of the 17 acre uplands tract,

[1] Now the Department of Environmental Protection and Energy.

[2] Recent amendments to the regulations have changed the numbering system. For example, the bay island regulations are now at *N.J.A.C.* 7:7E–3.21. We shall use the numbering system in effect when this matter was litigated below.

unless a porous surface is used, in which event the total impervious coverage will be 14.5%.

In 1985 and 1986, the Commissioner denied a permit for the project. SMB appealed from the Commissioner's decision, and the matter was referred to the Office of Administrative Law as a contested case. After a hearing, the Administrative Law Judge (ALJ) concluded "that the Commissioner can ... generally find that the project as proposed will meet" the CAFRA standards, with the imposition of certain conditions.

In a Final Decision, dated January 8, 1988, the Commissioner rejected the ALJ's Initial Decision. The Commissioner denied the permit because he was "unable to make the necessary positive findings as required by [CAFRA] and as embodied in the rules on Coastal Resources and Development." The Commissioner advanced seven specific reasons for his denial of the permit. He determined that the site is a "bay island corridor" and that the regulations implementing the bay island corridor policy prohibited the project. He also determined that the project violated regulations implementing the general land area policy.

SMB appealed to this court, and in an unpublished opinion another panel affirmed "the decision to deny SMB the permits based on the Commissioner's rationale concerning the bay island corridor policy and the general land areas policy." We reversed the Commissioner's determination that the project violated other regulations and policies such as the protection of productive shellfish beds, loss of navigability of a channel which is part of the Intracoastal Waterway, violation of wetlands regulations through construction of the elevated access roadway, inadequacy of the proposed 50 foot wetlands buffer, and absence of an approvable storm water runoff plan. *SMB Associates v. N.J. Dep't of Envtl. Protection*, No. A–2175–87 (App.Div. March 23, 1989), *certif. denied*, 117 *N.J.* 154, 564 *A.2d* 874 (1989). At the conclusion of the opinion this court stated:

However, as previously indicated, we anticipate that SMB may elect to submit *a revised plan* together with requests for a waiver which may meet with DEP's approval. If so, the DEP might want to reassess its denial justified only by the

bay island corridor policy and the general land areas policy. That is, with all other policies in compliance, the agency might want to evaluate the impact of any *revised* proposal. For example, the regulations provide only that coastal development which does not conform to the acceptable intensity of development is discouraged, not prohibited. *N.J.A.C.* 7:7E–5.2(c) [3] While we will not speculate further, we do note that it is possible that, if intensity of development were the only factor standing in the way of SMB's project, a plan *modification* in that respect might result in DEP approval.

[Slip op. at 27–28 (emphasis added) (footnote added).]

After the opinion was filed, SMB's counsel requested "a waiver of the 5% maximum lot coverage requirement of the Bay Island Corridor Policy and General Land Area Policy so as to permit issuance of a CAFRA permit for the project as proposed." SMB did not file a modified or revised plan. The DEP denied the waiver. SMB appealed to CARB which is authorized "to hear appeals from decisions of the commissioner" granting or denying a permit. *N.J.S.A.* 13:19–13. CARB has three voting members: the Commissioner of DEP; the Commissioner of Commerce and Economic Development; and the Commissioner of Community Affairs. CARB granted the waiver, over the DEP Commissioner's objection, by a decision dated November 27, 1990. The DEP moved for reconsideration by CARB. CARB did reconsider but granted "a waiver of the Bay Island Corridor Policy" and directed the issuance of a permit, again over the DEP commissioner's objection.

Despite its vigorous opposition to the granting of a waiver, the DEP did not appeal from CARB's decision. However, appellants did file a notice of appeal, though they had not previously participated in the administrative proceedings or in this court on the occasion of SMB's appeal.

The issues are whether appellants have standing to appeal CARB's decision; whether a "waiver" of DEP regulations implementing CAFRA may be granted in the absence of a rule autho-

---

[3] This is a reference to a general land areas regulation. The bay island regulation *prohibits* development above the specified intensity. *N.J.A.C.* 7:7E–3.24(d). See discussion *infra*.

rizing waiver and establishing standards for the exercise of the power to waive;[4] whether the doctrine of "law of the case" applies so as to vest waiver authority in the agency below; and whether, assuming the power to waive, CARB properly exercised it.

## I

SMB contends that appellants lack standing to appeal CARB's action because appellants did not participate below and were not parties in any of the proceedings below.

Appellant D.W. Bennett is the Executive Director of the American Littoral Society (ALS). According to a certification filed by Bennett, ALS is a non-profit organization whose goal is to encourage the study and conservation of marine life and its habitat, especially in the coastal zone. ALS has approximately 9,000 members, half of whom reside in New Jersey. The organization has offices at Sandy Hook and monitors coastal development in New Jersey, including all permits for dredging and filling and all CAFRA permits. The organization has officially ·commented on permits at public hearings, submitted written testimony and participated as a party in appeals to the Appellate Division with regard to the issuance of CAFRA permits. Bennett stated in his certification that he personally uses the coastal waters of New Jersey for recreation, including surf and bay fishing.

Richard Crema also filed a certification. Crema described himself as a full time commercial shell fisherman who works primarily in the back bays of Atlantic County, including the area involved in the present case. Crema maintains that the issuance of a CAFRA permit to SMB will jeopardize the waters in which he earns his living.

Appellants contend that they "have a sufficient interest to represent the public interest" to challenge CARB's decision. They further argue that they have standing because the Attorney

---

[4] This court raised the issue prior to oral argument and requested and received supplemental briefs from each party and from the DEP.

General, "a likely challenger and advocate for those views expressed by the ALS and the other appellants," represents the two departments whose commissioners voted in favor of the decision, and also represents the DEP. In their reply brief, appellants assert that "[t]here was no adjoining landowner involved to contest the permit because the land involved here is an island," and that "[t]here might have been a public interest group that had the resources to contest this matter from its inception or perhaps at another level but that simply was not the case." They also contend that "it is well established that the ALS did not have the right to request or participate in an administrative law hearing regarding the factual determinations that really make up the justification for the decision in this matter."

SMB maintains that because appellants deliberately chose not to participate in the CARB proceedings, they failed to exhaust the available administrative remedies and, therefore, lack standing to appeal. SMB points to a certification filed by Bennett in opposition to SMB's motion to dismiss the appeal in which he stated that he has been monitoring SMB's permit application for several years on behalf of ALS but that due to limited funds and staff "we do not intervene or seek to take part directly in any matter in which we believe the interest of the public is properly being considered and weighed by the appropriate governmental authorities." SMB also contends that appellants' appeal is barred because it presents issues which were not raised below and may not be considered here for the first time. Finally, SMB argues that appellants are guilty of laches and that "fundamental fairness" and "administrative due process" require dismissal of the appeal because of appellants' delay in intervening in this matter.

 SMB's contention that the doctrine of exhaustion of administrative remedies deprives appellants of standing is without merit. *R.* 2:2–3(a)(2) precludes appeals from final decisions of administrative agencies to the Appellate Division "so long as there is available a right of review before any administrative agency or officer." The exhaustion of remedies doctrine serves three pri-

mary goals: (1) ensuring that claims will be heard initially by a body with expertise in the area; (2) allowing the parties to create a factual record necessary for meaningful appellate review; and (3) allowing an opportunity for the agency decision to satisfy the parties and thus obviate the need for unnecessary adjudication. *Atlantic City v. Laezza*, 80 *N.J.* 255, 265, 403 *A.2d* 465 (1979). Thus, the doctrine clearly operates to prevent a party from prematurely resorting to the appellate process. The doctrine has no application here, as there is no allegation that appellants may obtain review at the administrative level.

Our courts have held that a "slight private interest, added to and harmonizing with the public interest," is sufficient to give standing to seek judicial review of official action. *Elizabeth Federal S & L Ass'n v. Howell*, 24 *N.J.* 488, 499, 132 *A.2d* 779 (1957) (quoting *Hudson Bergen, etc. Ass'n v. Bd. of Comm'rs of City of Hoboken*, 135 *N.J.L.* 502, 510, 52 *A.2d* 668 (E. & A. 1947)). Moreover, the right to seek judicial review of administrative decisions "inheres not only in those who are direct parties to the initial proceedings before an administrative agency ... but also belongs to all persons who are directly affected by and aggrieved as a result of the particular action sought to be brought before the courts for review." *Id.*, 24 *N.J.* at 499–500, 132 *A.2d* 779.

*In re Waterfront Dev. Permit*, 244 *N.J.Super.* 426, 582 *A.2d* 1018 (App.Div.1990), *certif. denied*, 126 *N.J.* 320, 598 *A.2d* 880 (1991), supports appellants' contention that they have standing. In that case, this court held that the DEP Commissioner violated his own regulations by intervening and ordering the issuance of a waterfront development permit while the permit application was still pending before the Division of Coastal Resources. The permit allowed construction of two 160–foot high commercial towers as part of a mixed-use office, retail, hotel and residential complex along the Hudson River in Weehawken. The buildings would impair the view of the Hudson River shoreline enjoyed daily by thousands of bus and car passengers from the Lincoln Tunnel Helix. ALS, an appellant in the present matter, requested and was denied a review hearing of the Commissioner's determination

pursuant to *N.J.A.C.* 7:7–5.1. Thereafter, ALS filed an appeal in the Appellate Division.

This court agreed with the Commissioner's decision to deny ALS a review hearing, noting that a trial-type adjudicatory hearing is not allowed in such matters except to applicants who can show a statutory right or a constitutionally protected interest. However, we held that ALS had the necessary standing to seek judicial review of the Commissioner's determination granting the permit. *Id.*, 244 *N.J.Super.* at 437–38, 582 *A.*2d 1018. We noted the conflict between local residents, who have no interest in preserving the view because of their direct access to the Lincoln Tunnel from local roads and who stand to benefit economically from the development, and the thousands of commuters and other passengers who enjoy the view but who are unorganized and unlikely to attend public hearings on the matter. In our opinion, we stated:

> It is imperative that regional interests be spoken for in this proceeding. If such organizations as ALS do not have the necessary standing, "who then is there who can or will challenge an administrative decision favorable to the applicant? Without standing in the appellants to invoke the power of judicial review, the Commissioner's action favorable to [Hartz Mountain], right or wrong, proper or arbitrary, takes on a conclusive character to the possible great detriment of the people as a whole."

> [*Id.* at 438, 582 *A.*2d 1018 (quoting *Elizabeth Federal S. & L. Assn. v. Howell*, 24 *N.J.* 488, 501–02, 132 *A.*2d 779 (1957).]

Applying those principles we are persuaded that appellants herein have standing to prosecute this appeal. After this court affirmed the Commissioner's denial of SMB's permit application, the DEP also denied SMB's request for a waiver. The Commissioner defended that denial before CARB and voted against the waiver in the CARB proceeding. However, the Commissioner did not appeal from the CARB grant of the waiver. Thus, if appellants do not have standing, "who then is there who can or will challenge" the waiver, thereby advancing the public interest? *Ibid.*

## II

. We now address the second issue: whether a waiver may be granted in the absence of a rule authorizing waivers and establishing standards for the exercise of waiver authority. Before we discuss the law, however, we shall describe what CARB accomplished through its waiver.

As previously indicated, in our prior opinion we affirmed the Commissioner's denial of the permit on the ground that the project violated the general land areas policy (general policy) and the bay island corridor policy (bay policy). The bay island corridor "is composed of non-oceanfront islands surrounded by tidal waters," N.J.A.C. 7:7E–3.24(a)(2), consisting of "that portion lying upland of wetlands and beaches but including the filled water's edge." N.J.A.C. 7:7E–3.24(a)(3). "Water dependent development is *discouraged* on bay island corridors which do not abut a paved public road and not served by a sewerage system with adequate capacity. All other types of development are *prohibited* in these areas." N.J.A.C. 7:7E–3.24(c) (emphasis added). "On bay island corridors which abut a paved public road and sewerage system with adequate capacity, water dependent development is acceptable and all other development is acceptable only at a low intensity." N.J.A.C. 7:7E–3.24(d). Low intensity is defined as 3 to 5% of the upland area being covered with impervious surfaces. Of all the elements of SMB's project, only the marina is "water dependent." N.J.A.C. 7:7E–1.5.

The impact of the Commissioner's 1988 decision as affirmed by us in our earlier opinion is that the bay policy applies and prohibits non-water dependent development because the site does not abut a paved public road and is not served by a sewerage system. At best, non-water dependent development could be constructed only at low intensity even if the site is deemed to abut a paved public road and is served by an adequate sewerage system.

Development of the site is also limited to a maximum of 5% impervious coverage under the general lands policy because the

site is more than 1,000 feet from an existing sewer line. *N.J.A.C.* 7:7E–5.5(b)4ii. It is 4,000 feet from a sewer line.

CARB waived those requirements and limitations, thereby permitting non-water dependent development with impervious coverage of 14.5%, almost triple the greatest permissible coverage under the bay policy. CARB's decision also waived the requirements that the project abut a paved road and be within 1,000 feet of a sewerage system, thereby authorizing a 4,000 foot extension of an existing sewer line and construction of 600 feet of access road to connect the development with Route 152.

A written decision by CARB on November 27, 1990 set forth three findings, which may be summarized as follows:

(1) The fact that the proposed site does not have direct access to a paved public road may be remedied by construction of the proposed elevated roadway; (2) the fact that the site is not currently served by a sewage disposal system with adequate capacity "should be correctable" by a 4,000 foot extension of the sewer line which, the uncontradicted evidence established, will have no secondary impact; and (3) the requirement that the project include low and moderate income housing would satisfy the Commissioner's implicit requirement that an applicant for a waiver demonstrate that the granting of the waiver will not only not undermine the objectives of the regulatory scheme, but will, as in the case of the Gateway [5] project, "affirmatively advance the public interest in a significant way." CARB had imposed the affordable housing requirement as a condition of its waiver.

DEP subsequently moved for reconsideration of CARB's decision, in part because imposition of the requirement of low and moderate income housing was unlawful. *N.J.S.A.* 13:19–11.1. A hearing was held on January 15, 1991, at which time CARB decided, by the same 2–1 vote, to reaffirm its prior decision while eliminating the affordable housing requirement. On April 10,

---

[5] Gateway refers to a project previously granted a waiver by the Commissioner.

1991, CARB issued a decision granting SMB's request for a waiver "of the Bay Island Corridor Policy" and directing a CAF-RA permit to be issued subject to several conditions. The decision included a finding that:

The project, as presented, does benefit the public interest in that it provides needed marina space and housing units. Further, this project does not adversely impact and undermine the Bay Island Corridor Policy of the Department of Environmental Protection.

Thus, in this case CARB effected, through the device of waiver, a nullification of important policy determinations expressed in DEP regulations implementing CAFRA. We conclude that neither CARB nor the Commissioner had the authority to grant such a waiver in the absence of a regulation, adopted pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B-1 to -15, authorizing waivers and establishing appropriate standards for the exercise of waiver authority.

*Iuppo v. Burke,* 162 *N.J.Super.* 538, 394 *A.2d* 96 (App.Div.), *certif. denied,* 79 *N.J.* 462, 401 *A.2d* 219 (1978), involved a State Board of Education regulation requiring the Commissioner of Education to classify each school district annually as approved, conditionally approved or unapproved. In April 1977, the Board excused the Commissioner's compliance with the annual classification for the 1976-77 school year. We held that the Board could not suspend its own regulation without adopting a regulation to that effect in compliance with the Administrative Procedure Act. *Id.,* 162 *N.J.Super.* at 550, 394 *A.2d* 96. *See also In re Waterfront Dev. Permit, supra,* 244 *N.J.Super.* at 434, 582 *A.2d* 1018 (permit invalid because Commissioner violated DEP regulations in granting permit while application was still pending before Division of Coastal Resources). We are persuaded that our holding in *Iuppo* and our conclusion in the present case are consistent with principles of administrative law expressed by our Supreme Court in *State, Dep't of Envtl. Protection v. Stavola, supra; Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 478 *A.2d* 742 (1984); and *Crema v. N.J. Dep't of Envtl. Protection, supra.*

*Crema* involved DEP's grant of conceptual approval to a large scale residential and commercial project subject to CAFRA. The Court held that DEP's authority to establish a conceptual approval scheme "can reasonably be implied" from CAFRA. 94 *N.J.* at 299, 463 *A.*2d 910. The issue, therefore, was whether "the establishment of that authority should be undertaken through administrative rulemaking or adjudication." *Ibid.*

After noting that an administrative agency enjoys a "high degree of discretion," *ibid.,* in choosing between adjudication or rulemaking, the Court stated:

Nevertheless, the discretion in the administrative choice between rulemaking and adjudication has limits. *See N.J.S.A.* 52:14B–2(b), (c), (e). This Court has recognized the need and efficacy of rulemaking for establishing administrative law, *see, e.g., General Assembly of State of New Jersey v. Byrne,* 90 *N.J.* 376, 385 [448 *A.*2d 438] (1982); *R.H. Macy & Co., Inc. v. Director, Division of Taxation,* 41 *N.J.* 3, 4 [194 *A.*2d 457] (1963). When the agency is concerned with "broad policy issues" that affect the public-at-large or an entire field of endeavor or important areas of social concern, or the contemplated action is intended to have wide application and prospective effect, rulemaking becomes the suitable mode of proceeding.

[*Ibid.* (citations omitted).]

The Court held that the process of conceptual review and approval of proposed developments, "to the extent the exercise of this authority purports to establish enforceable rights ... require advance promulgation of regulatory standards both substantive and procedural," through rulemaking. *Id.,* 94 *N.J.* at 303, 463 *A.*2d 910.

The Court was particularly concerned about the need to provide substantive criteria and the opportunity of the public to shape the criteria, elements of particular importance in the present case. The Court observed:

Further, the actions taken by DEP that resulted in the issuance of a "conceptual approval" could not have been fairly anticipated or addressed by the interested public since that authority was not specifically provided by the statute or any regulation prior to its exercise in this case. Additionally, there were no substantive criteria established before the administrative proceedings for determining how to qualify for a "conceptual approval." Thus, the public and any affected or interested parties were without any firm knowledge of the factors that the agency would deem relevant and that might influence its ultimate decision. The public had no meaningful opportunity to shape the criteria that ultimately affected their interests.

[*Id.* at 302, 463 *A.*2d 910.]

*Stavola* also involved CAFRA. As previously indicated, CAF-RA requires a DEP permit for construction of any "facility" in the coastal area. CAFRA defines "facility" as including the construction of "25 or more dwelling units or equivalent." *N.J.S.A.* 13:19–3c(5). The DEP contended that certain deluxe beach club cabana units were facilities, *i.e.*, "dwelling units or equivalent." *Ibid.*

The Court ruled that CAFRA authorized the DEP "to promulgate rules and regulations that interpret a seaside beach club cabana as 'equivalent' to a 'housing development of 25 or more dwelling units.'" *Stavola, supra*, 103 *N.J.* at 433, 511 *A.*2d 622. However, the Court held that DEP had to act through rulemaking to subject beach cabanas to CAFRA rather than through *ad hoc* adjudication. The court observed that *ad hoc* adjudication was unfair because there were no standards by which other beach clubs could determine whether they are subject to regulation. "The lack of any specific standard results in confusion to the public and to DEP. Promulgating a regulation through rulemaking will aid not only beach club owners but also DEP in formulating guidelines for its own inspectors to determine whether a cabana is 'deluxe enough' to be subject to DEP regulation." *Id.* at 438, 511 *A.*2d 622.

*Metromedia, Inc. v. Director, Div. of Taxation, supra*, preceded *Stavola.* In that case, the Director, in applying the New Jersey Corporation Business Tax Act to Metromedia's out-of-state television and radio stations broadcasting into New Jersey, computed Metromedia's receipts attributable to New Jersey based upon the stations' audience shares in New Jersey. Recognizing that the statute vested broad discretionary authority in the Director to determine the percentage of a taxpayer's net worth and net income attributed to New Jersey, the Court concluded that the Director had the statutory authority to utilize audience share as a measure of New Jersey income.

The critical issue, however, was whether use of audience share constituted *de facto* rulemaking which had to comply with the rule promulgation requirements of the Administrative Procedure Act.

In resolving this issue, the Court began with the definition of a rule contained in the APA:

"Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy....

[*N.J.S.A.* 52:14B–2(e).]

After discussing the various considerations which inform the distinction between rulemaking and adjudication, the Court summarized them as follows:

We can synthesize from this authority that an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.

[*Metromedia, supra,* 97 *N.J.* at 331–32, 478 *A.*2d 742.]

The Court acknowledged that the question is a close one in many cases and frequently "the agency determination is a hybrid, partaking of both the rule-making and adjudicating mode." *Id.* at 332, 478 *A.*2d 742. The Court concluded its exposition of guiding principles by stating:

Nevertheless, rule-making and adjudication are not interchangeable. If the several relevant features that typify administrative rules and rule-making weigh in favor of action that is quasi-legislative in character, rather than quasi-judicial or adjudicatory, that balance should determine the procedural steps required to validate the ultimate agency action.

[*Ibid.*]

Applying those principles, the Court concluded:

In balancing the relevant factors before us, we are satisfied that the instant agency determination constituted a rule, and that its adoption required compliance with

statutory rule-making procedures. The challenged determination clearly is one of general applicability to the reguated class. It is essentially prospective in nature, notwithstanding its attempted application to the taxpayer in this case. It was intended to have continuing effect, since, as the Director conceded, the audience share factor applies to all other broadcasters similarly situated to Metromedia. The Director admitted at trial that "[a]ll broadcasters * * * who are in the same predicament or situation as [Metromedia] would be subject to the revision." There is no question, therefore, that the determination is intended to be a rule of unvarying application to all similar cases.

[*Id.* at 334, 478 A.2d 742.]

Informed by the principles announced in *Crema, Stavola* and *Metromedia,* we are persuaded that the power to waive CAFRA regulations must be exercised through the adoption of a rule establishing standards for the application of waiver authority. Almost all the *Metromedia* factors apply. The authority to waive is applicable to all applications for development permits, *i.e.,* any applicant may request a waiver. Thus, the waiver authority is of general application operable in all future cases.

The fourth *Metromedia* factor, that the agency determination "prescribe a legal standard or directive," is implicated in a negative sense. There are no legal standards for the exercise of the power to waive regulatory requirements, and that is the primary problem. The establishment of substantive and procedural standards governing the exercise of waiver authority is critical to the exercise of that power in the public interest. CAFRA does not expressly or impliedly provide waiver standards. To the contrary, *N.J.S.A.* 13:19–11 authorizes the commissioner to *deny* a permit under certain circumstances though the applicant has complied with the criteria in *N.J.S.A.* 13:19–10. The absence of standards encourages arbitrary action, and deprives applicants, other interested parties and the public of advance notice of the rules of the waiver process, thereby precluding meaningful participation in that process and effective appellate review. The promulgation of standards governing waiver announces the agency's intent to exercise the authority to waive in appropriate cases and permits participation of interested parties and the public in shaping waiver criteria. Public awareness of an agency's intention to reserve the power to grant variances may impact an interested party's evalua-

tion of the agency's substantive regulations. A body of rules adequate on its face may be deemed inadequate in light of a reservation of broad waiver authority.

The fourth *Metromedia* factor is also applicable because, in the absence of promulgated standards, two members of CARB attempted to improvise a public interest standard, initially justifying the waiver through imposition of an affordable housing component on the project. Upon being advised that imposition of the component was prohibited by statute, the CARB majority justified the waiver based on the need for marina space and housing. That standard is so broad that it applies to every project designed to produce housing or marina space. Because the criteria utilized by the CARB majority is not established in a promulgated rule, it may not be applied in the next case. Thus, the criteria utilized by CARB in the present case will either nullify adopted regulations expressing the bay island and general land policies, if applied to all projects, or will result in the arbitrary and uneven exercise of waiver authority, if it is not applied to all projects.[6]

The express grant or reservation of waiver authority and the concomitant establishment of waiver standards is a well-established feature of land development regulation in New Jersey. The Municipal Land Use Law authorizes variances from zoning regulations. *N.J.S.A.* 40:55D–70c and d. It also authorizes variances from the requirement that a building lot abut a street, *N.J.S.A.*

---

[6] The power to waive is similar to the power not to enforce. Although expressed in a slightly different context, one commentator framed the problem in persuasive language:

> All the regulatory agencies have important power not to enforce—to push a little more or a little less, to be more aggressive or more apathetic, to hold out against pressures for nonenforcement or for weak enforcement or to yield to such pressures, to carry out the intent behind the legislation or to allow regulated parties to gain the upper hand.
>
> Discretion not to enforce is most damaging when it is unevenly exercised from case to case.

[K.C. Davis, *Administrative Law Treatise*, § 9:1 at 216 (2d ed. 1979).]

40:55D–35 and 36, and from the requirements of subdivision and site plan regulations. *N.J.S.A.* 40:55D–51a and b.

Similarly, the Pinelands Protection Act, authorizes the Pinelands Commission to waive "strict compliance" with the comprehensive management plan for the protection of the pinelands "upon finding that such waiver is necessary to alleviate extraordinary hardship or to satisfy a compelling public need, is consistent with the purposes and provisions of the act ... and would not result in substantial impairment of the resources of the pineland area." *N.J.S.A.* 13:18A–10c. The statute authorizes the commission to "adopt rules and regulations which specify the standards for determining such extraordinary hardship, compelling public need, consistency and substantial impairment." *Ibid.* The commission's comprehensive waiver regulations are at *N.J.A.C.* 7:50–4.61 to –4.70.

Moreover, in his 1988 Final Decision, the Commissioner recognized the importance of waiver regulations. In rejecting the ALJ's determination that the 1,000 feet limitation on extension of a sewer line, contained in the general policy, should not be the basis for denial of a permit, the Commissioner stated that "[t]here is no established procedure in the regulation for a waiver of this regulation." The Commissioner, nevertheless, implied that the bay policy was waivable when he ruled that it must be applied "in the absence of a request for a waiver and an approval of the request." 

In his supplemental brief, the Attorney General takes the position that a waiver rule is not a prerequisite to the exercise of waiver authority. The Attorney General cites *Dougherty v. Human Services Dep't,* 91 *N.J.* 1, 449 *A.*2d 1235 (1982), which involved reimbursement of a family for the purchase of an air filtration device recommended by a physician as a treatment modality for a severely asthmatic child. The Division of Medical Assistance and Health Services denied the reimbursement claim because its regulations precluded reimbursement for the device. The Appellate Division held that the regulation was valid but that

it should be waived in the case before it. The Supreme Court upheld the regulation's validity but reversed the Appellate Division's waiver on the ground that a waiver should be considered in the first instance by the agency. Thus, the Court assumed that the agency had the power to waive. However, whether an agency may waive a regulation without a waiver rule and appropriate standards was not addressed and apparently, was not raised. Moreover, as the Attorney General points out, the relevance of *Dougherty* to the issue at hand is clouded by the existence of a regulation, in effect at the time of the fair hearing before the agency, which provided that the fair hearing include consideration of "the reasonableness and equitableness [sic] of the policies promulgated under law if the complainant is aggrieved by their application to his situation." *Id.* at 8, 449 *A.*2d 1235.

We are not persuaded that *Citizens for Equity v. Dep't of Envtl. Protection,* 126 *N.J.* 391, 599 *A.*2d 507 (1991), supports the Attorney General's position. In that case, the Court held that the DEP's suspension of claims *processing* against the Sanitary Landfill Contingency Fund, pending the agency's adoption of new and more burdensome regulations governing claims against the fund, did not constitute rule making under the Administrative Procedure Act. *Id.* at 396, 599 *A.*2d 507.

*In re Fair Hearing,* 138 *N.J.Super.* 417, 351 *A.*2d 363 (App.Div. 1976), also cited by the Attorney General, is inapposite. In that case an agency rejected as untimely a claim for nursing home expenses. The Appellate Division reversed and ordered that the claim be paid, thereby effecting a non-enforcement of the agency's six-month limitation period for submission of claims. The case is distinguishable for two reasons. The limitation period was established in an agency "Circular Letter," *id.* at 420, 351 *A.*2d 363, rather than in an adopted regulation, and the Circular Letter contained a policy statement authorizing exceptions from the six-month limitation period in certain circumstances. *Id.* at 422, 351 *A.*2d 363.

The federal cases cited by the Attorney General are not helpful. *United States v. Storer Broadcasting Co.*, 351 *U.S.* 192, 76 *S.Ct.* 763, 100 *L.Ed.* 1081 (1956); *Nat'l Broadcasting Co. v. United States*, 319 *U.S.* 190, 63 *S.Ct.* 997, 87 *L.Ed.* 1344 (1943); *P & R Temmer v. F.C.C.*, 743 *F.*2d 918 (D.C.Cir.1984); *Nat'l Nutritional Foods Ass'n v. Food & Drug Admin.*, 504 *F.*2d 761 (2d Cir.1974), *cert. denied*, 420 *U.S.* 946, 95 *S.Ct.* 1326, 43 *L.Ed.*2d 424 (1975). Three of the cited cases involved agency regulations which included waiver rules, *Storer, supra*, 351 *U.S.* at 201 n. 10, 76 *S.Ct.* at 769 n. 10, 100 *L.Ed.* at 1090; *P & R Temmer, supra*, 743 *F.*2d at 929 ("The FCC's rules specifically provide for a waiver of its rules on a showing of 'good cause.' "); *Nat'l Nutritional Foods Ass'n, supra*, 504 *F.*2d at 784 n. 26. The fourth case, *Nat'l Broadcasting Co.*, involved the validity of Federal Communications Commission regulations regulating chain broadcasting. The power to waive was not an issue.

We have found no helpful or persuasive decisions from other jurisdictions. Those decisions addressing the issue do so briefly, with little or no analysis, or deal with procedural rules. *See generally American Farm Lines v. Black Ball Freight*, 397 *U.S.* 532, 539, 90 *S.Ct.* 1288, 1292, 25 *L.Ed.*2d 547, 553 (1970) (agency has discretionary power to relax its procedural rules); *Gray Lines Tour Co. of Southern Nevada v. I.C.C.*, 824 *F.*2d 811, 814 (9th Cir.1987) (ordinarily, agency must follow its own rules but "it can alter previously announced policies, or fashion exceptions and qualifications, if it reasonably explains the alteration"); [7] *Micu v. City of Warren*, 147 *Mich.App.* 573, 382 *N.W.*2d 823, 828 (1985) ("once promulgated, the rules made by an agency ... cannot be violated or waived by the agency); *Lake Placid Club, Inc. v. Abrams*, 6 *N.Y.*2d 857, 188 *N.Y.S.*2d 561, 160 *N.E.*2d 92 (1959) (agency chairperson had power to waive regulations limiting time for application for reconsideration); *Eastwood Bldg. Comm. of*

---

[7] This case appears to involve a departure from a policy announced in the agency's decisions. *See Atchison, T. & S.F. Co. v. Wichita Bd. of Trade*, 412 *U.S.* 800, 93 *S.Ct.* 2367, 37 *L.Ed.*2d 350 (1973).

*Roosevelt Island v. Berman,* 118 *Misc.*2d 494, 461 *N.Y.S.*2d 184, 185 (Sup.Ct.1983) (agency may waive its rules in the interests of justice unless substantial rights are prejudiced).

■ In concluding that CARB's waiver in this case was unlawful in the absence of a waiver regulation we recognize the persuasiveness of the argument that an agency has inherent power to waive *de minimus* violations of objective standards. This case, however, does not fit into that category. CARB waived regulations which enforce important policy determinations regarding the development of coastal area lands. *Cf. Vi–Concrete Co. v. State, D.E.P.,* 115 *N.J.* 1, 12, 556 *A.*2d 761 (1989) (requirement that closed landfills install monitoring wells should be established through rulemaking); *DelRossi v. DHS,* 256 *N.J.Super.* 286, 293, 606 *A.*2d 1128 (App.Div.1992) (award of back pay to employees suspended pending disposition of criminal charges requires a policy decision through rulemaking).

### III

It is necessary to address SMB's contention that the power to waive the CAFRA regulations is part of the law of this case based on the prior opinion of this court.

The first contention is based on the following paragraph in this court's prior opinion:

We note at this point that at oral argument, there was some discussion concerning whether the Commissioner had the authority to "waive" such a regulation if requested. The Deputy Attorney General attempted to distinguish between an "exemption" which had been granted to the Gateway developer and the grant of a "waiver" as such. Suffice it to say that we perceive no reason to discriminate between the two for the purposes of determining the Commissioner's authority to do so here. Since he promulgated the regulation in the first place he certainly has the power to grant exceptions therefrom upon a showing of good cause, whether one calls it an "exemption" or a "waiver."

[Slip op. at 11–12.]

■ ■ "The 'law of the case' doctrine sometimes requires a decision of law made in a particular case to be respected by all other lower or equal courts during the pendency of that case." *State v. Reldan,* 100 *N.J.* 187, 203, 495 *A.*2d 76 (1985). *See State*

*v. Hale,* 127 *N.J.Super.* 407, 317 *A.*2d 731 (App.Div.1974). Application of the principle is discretionary. *Reldan, supra,* 100 *N.J.* at 205, 495 *A.*2d 76. "It should be applied flexibly to serve the interests of justice." *Ibid.* The principle "is grounded in the policy that once an issue is litigated and decided in a suit, relitigation of that issue should be avoided if possible." *Sisler v. Gannett Co., Inc.,* 222 *N.J.Super.* 153, 159, 536 *A.*2d 299 (App.Div. 1987), *certif. denied,* 110 *N.J.* 304, 540 *A.*2d 1283 (1988). Consistent with the discretionary nature of the principle, "the court is never irrevocably bound by its prior interlocutory ruling in the same case." *Ibid.* However, the doctrine is more stringent when it is applied to a prior appellate decision in the same case. *Id.* at 160, 536 *A.*2d 299 (citing *Hale, supra,* 127 *N.J.Super.* at 410, 317 *A.*2d 731; *State v. Cusick,* 116 *N.J.Super.* 482, 485, 282 *A.*2d 781 (App.Div.1971); *Ehnes v. King,* 50 *N.J.Super.* 109, 113, 141 *A.*2d 62 (App.Div.1958)). "Also, there is in any event the further principle that the law of the case doctrine will not apply to an ambiguous or uncertain decision." *Sisler, supra,* 222 *N.J.Super.* at 160, 536 *A.*2d 299.

We are persuaded that the principle does not apply in this case. We agree with the earlier opinion that the DEP has the power to waive standards established in its regulations. The important issue is whether that power must be exercised through adoption of a waiver rule and standards. That issue was not briefed in the previous appeal. The availability of a waiver was raised through "some discussion" at oral argument. We deem "some discussion" to be an inadequate predicate for application of the law of the case principle.

Moreover, as we indicated earlier in this opinion, the prior opinion contemplated a waiver application based upon a "revised plan." No revised plan was submitted by SMB. The earlier opinion is also riddled with ambiguity. It does not establish how the proposal might have been revised so as to qualify for a waiver. It does not clearly indicate the elements it deemed waivable, *i.e.,* the requirement that the project abut a road and a sewerage system, the bay policy prohibition of non-water dependent devel-

opment, the bay policy 5% impervious coverage limit, or the general policy 5% impervious coverage limit.

We also note that the prior opinion, in discussing the possibility of waiver after submission of a revised plan [8] limited its comment to *N.J.A.C.* 7:7E–5.2c of the general policy which discourages development in excess of the acceptable intensity. The opinion did not mention the bay policy which prohibits non-water dependent development above 5% impervious coverage.

Finally, in considering the law of the case principle, we deem it to be significant that our earlier opinion was an affirmance of the Commissioner's denial of development permits. We did not remand for reconsideration consistent with our opinion nor did we remand for consideration of a waiver application. The discussion of waiver was in the nature of a suggestion, a suggestion inextricably tied to the submission of a revised plan.

For these reasons the prior opinion is not binding regarding the waiver issue.

## IV

Our ruling in section II makes it unnecessary to decide the fourth issue, whether CARB properly executed its waiver power.

SMB's contention that it is entitled to a waiver because two other projects, Gateway and Sunset Marina, received waivers is without merit. We will not perpetuate the irregular exercise of power.

CARB's waiver of the applicable CAFRA regulations is reversed.

---

[8] Slip opinion, p. 27–28, quoted in this opinion at pp. 42–43, 624 A.2d at 16–17.